In the Matter of Marjorie Karp, as Proposed Conservator of the Property of Oscar Karp, Conservatee, Appellant. Herman E. Cooper, Guardian ad Litem, Respondent.

First Department, February 2, 1989

APPEARANCES OF COUNSEL

*Ellice Fatoullah* for appellant.

*Herman E. Cooper,* respondent *pro se.*

**OPINION OF THE COURT**

Asch, J.

The conservatee, Oscar Karp, sold his business at the end of 1982. It was failing; his family and friends realized that his memory and ability to handle complex issues were contemporaneously failing. Following the sale of his business, Karp became depressed. Then began a slow and steady deterioration of his condition, which finally led to a diagnosis of Alzheimer's disease together with other complications. Finally, when the conservatee was 72 years old, in April of 1987 this petition was filed.

The petitioner-appellant, Marjorie Karp, Oscar's second wife, met Oscar in 1950. She lived with him from 1972 on, after the death of his first wife. On November 6, 1983, petitioner and Oscar were married. Prior to that date, on August 27, 1982, they entered into an antenuptial agreement in which each renounced any claims to the other's estate. On July 5, 1983, Oscar executed a power of attorney giving Marjorie authority to act on his behalf in all matters and, on April 26, 1984, Oscar executed a new will directing that his estate be equally divided among Marjorie and his three adult sons of his first marriage.

As Oscar's condition deteriorated, the family decided, in 1987, to have Marjorie appointed conservator of his four and a half million dollar estate. Accordingly, a petition requesting such appointment was filed. In addition to seeking appointment of a guardian ad litem for the purpose of protecting Oscar's interests during the proceeding, petitioner Marjorie (who had her own business) requested that the court, *inter alia,* authorize the conservator to pay for Oscar's home aide and other uninsured health care costs out of the estate. As part of a plan to minimize estate taxes upon Oscar's demise, she also sought authorization for payments to each of the beneficiaries under his will. Petitioner also asked that she be entitled to collect $30,000 per year in commissions.

During the proceeding, it was apparent that a certain animosity existed between the guardian ad litem, Herman Cooper, and the conservator's attorney, Ellice Fatoullah. Petitioner's attorney, in a letter to the guardian, contended that the latter was prepared to recommend himself as an attorney for the conservator or as a continuing guardian subsequent to the proceedings. She charged that this would constitute a violation of the Code of Professional Responsibility. On his part, the guardian went to great lengths to determine from the medical evidence, from Oscar's attorney Isidore Sapir, and from Oscar's son Clifford, whether Oscar was possessed of his faculties when he signed the power of attorney in 1983. It was at the guardian's insistence that two adjournments of the hearing were ordered in order for him to pursue his investigation.

The uncontradicted testimony adduced at the hearing indicated that Oscar had executed the power of attorney after he asked his former attorney how he could effectively enable Marjorie to handle all his affairs. He again sought advice from Sapir when he prepared to execute a new will in 1984. Sapir testified that Oscar was possessed of his faculties during these conversations and that he had total confidence in Marjorie. Oscar's son, Clifford, testified that his father was active in real estate matters through 1983. By the time of the guardian's visit, however, Oscar was wild-eyed, incoherent and physically unmanageable; and by the time of the hearing, it appeared that Oscar was unable to dress or bathe himself.

Counsel for Marjorie explained the plan under which the four beneficiaries of Oscar's will would receive moneys each year to reduce the estate tax which would be due upon Oscar's eventual death. Subtracting Marjorie's marital deduction and

the $600,000 in Federal and State tax exemptions from the estimated four and a half million dollar estate, approximately three million dollars of the estate would be taxed at the 50% rate (26 USC § 2001 [c]). In order to minimize that tax, it was, accordingly, proposed that Oscar make annual tax-free gifts to each of the beneficiaries under his will. The conservator's estimate of an annual $120,000 deduction would leave $240,000 of Oscar's $360,000 annual income for his expenses.

Based upon Mental Hygiene Law § 77.27 and the Surrogate's Court Procedure Act rules governing commissions on four million dollar estates, Marjorie, as conservator, would be entitled to a commission in the amount of $100,000. Petitioner felt that figure was too high and so reduced her request to $30,000 a year.

Following the hearing, Oscar's three sons submitted affidavits and letters consenting to Marjorie's appointment as conservator. They noted her long-standing devotion to their father and the fact that, but for her, he would be institutionalized or dead.

The guardian submitted a report recommending the appointment of Marjorie as conservator, since such appointment would impose upon her an accountability lacking in her present status under the power of attorney. Mr. Cooper also consented to the proposed inter vivos distribution plan which would reduce the amount of the estate subject to estate taxes.

In a decision dated October 8, 1987, the IAS court found that Oscar Karp was incompetent to manage himself or his affairs. Petitioner was appointed conservator upon the posting of a surety bond in the amount of $2,100,000 and upon filing her designation pursuant to Mental Hygiene Law § 78.13. All of Oscar's assets and income were placed under Marjorie's conservatorship. The court did not address the proposed inter vivos distribution plan, the awarding of support to Marjorie, the setting of her commission as conservator or the issue of attorney's fees.

Thereafter, Mr. Cooper subsequently submitted an affidavit in support of his fee application, seeking fees in the amount of $25,000 and the recoupment of $855 in disbursements. The guardian ad litem estimated that he had spent approximately 80 to 100 hours determining (1) whether the power of attorney was properly executed in 1983, given the existence of an antenuptial agreement; (2) whether Oscar needed the appointment of a conservator since Marjorie seemed to be handling

his affairs pursuant to the power of attorney; (3) whether Alzheimer's disease is reversible and when its characteristic symptoms appeared in Oscar's case. He specifically stated that he did not keep time sheets but, in retrospect, estimated the time to approximate 80 to 100 hours at an hourly rate of $300 in addition to other time spent in reflection and conferring with other attorneys.

Petitioner's counsel, in opposition to the guardian's requested fee, argued that the fee was excessive, inasmuch as the proceeding was uncontested and that Mr. Cooper gave no accounting for how he expended his time. Furthermore, it was asserted that the issues cited by the guardian ad litem as demanding his attention were issues he himself created. It was alleged that the determination of whether Oscar "needed" the appointment of a conservator was irrelevant since the proceeding was uncontested and there was clear and convincing evidence, as shown by the testimony of Dr. Barry Reisberg, that Karp, by reason of the Alzheimer's disease, was unable to manage his own affairs. Extensive reading of treatises dealing with Alzheimer's disease was deemed unnecessary and review of Oscar's medical records, which consisted of a 2-to-3-page letter and a 25-page report, should have taken no more than three hours. Whether Oscar was competent when he signed the power of attorney was also deemed an irrelevant issue in this proceeding.

Petitioner's attorney submitted an affidavit in support of her own application for $25,512 in attorney's fees and $1,005.75 for disbursements. Counsel billed the 99.1 hours she spent on the case at the rate of $220. Her associate's 21.2 hours of work were billed at $175 per hour. Attached to the affidavit were three pages detailing the work done on the case and the time expended in each task.

The IAS court signed an order omitting certain paragraphs contained in a proposed order submitted by petitioner pertaining to Marjorie's support payment, the plan of distribution to reduce estate taxes and payment of petitioner's attorney. The guardian was awarded fees and disbursements totaling $25,855, as requested. The conservator was authorized commissions of $30,000 per annum.

Following petitioner's posting of a bond in satisfaction of the other requirements pertaining to her conservatorship, the court issued a commission to conservator which conditioned petitioner's appointment upon payment of the guardian forthwith.

This court subsequently stayed payment of the guardian pending determination of the appeals from the order and the commission.

■ Since the IAS court made no findings either with respect to the award of counsel fees to the guardian or to the *sub silentio* denial of counsel fees to the petitioner's attorney, we remand to the Supreme Court, before another IAS Part, for fixation of such fees *(see, Baker v Chock Full O'Nuts Corp.,* 30 AD2d 329, 333). Since the conservatee has died during the pendency of this appeal, we do not remand either the proposed support for the conservator or the proposed distribution plan for a like determination on the merits. However, since questions concerning this latter issue may be raised, we note we would have denied this request upon the record herein for the following reasons:

■ Under the substitution of judgment doctrine, courts may order payment from an incompetent's estate upon finding that the incompetent, if sane, would have made such payment *(Matter of Flagler,* 248 NY 415, 418-420). The following factors have been considered by the courts: (1) the amount of the incompetent's estate; (2) medical testimony regarding the permanency of the illness, the incompetent's needs and life expectancy; (3) the incompetent's gift-giving disposition to the intended beneficiaries prior to the illness; (4) the testamentary scheme provided by the incompetent; and (5) the tax consequences of the gifts. *(See, Matter of Fairbairn,* 56 AD2d 259; *Matter of Newlin,* 119 Misc 2d 815, 820-821; *Matter of Kurnyk,* 109 Misc 2d 1019; *Matter of Turner v Turner,* 61 Misc 2d 153, 155; Rohan, *Caring for Persons Under a Disability: A Critique of the Role of the Conservator and the "Substitution of Judgment Doctrine",* 52 St. John's L Rev 1-41 [1977], and cases cited therein; *see also,* Asch, *Compensation of Counsel Under Section 231-A Of The Surrogates' Court Act,* 26 NYU L Rev 322 [1951].)

While the record before us conclusively establishes that the conservatee's disease was irreversible, there was no evidence submitted as to his life expectancy. At the same time, the record indicates weekly uninsured health care costs of $2,300 ($1,500 for home aide and $80 for physical therapy). This amount, which totals approximately $120,000 per year, would most probably increase as the disease (as well as the cost of medical care) progressed. Based on the current estimate of $8,000 in monthly household expenses, those costs could,

therefore, have been expected to total almost $100,000 per year. If the inter vivos distribution plan had been instituted, Karp's annual income of $360,000 would provide only a slim margin over the combined outlay for the anticipated increase in his expenses. Not only is the record unclear as to these outlays of cash, it does not indicate whether the larger source of the conservatee's income, which takes the form of interest payments on two mortgages totaling $3,000,000, would be reduced over time.

Although it can be accepted that Oscar's estate would have obtained a tax advantage by immediate distribution of some assets, the record does not contain detailed information regarding the actual application of the Federal tax statutes to the estate. In addition, there is no standard by which this court could determine whether a distribution plan less than the amount requested in the petition might have been more appropriate.

Finally, there is no evidence in the record that Oscar intended his family to benefit from his largess prior to his demise. In fact, as recently as 1983, Oscar loaned his son, Clifford, $30,000 to open a restaurant. That loan was commemorated in a formal agreement, and it was subsequently repaid. Nor was there evidence presented that Oscar was particularly generous to Marjorie.

The enumerated considerations for application of the substitution of judgment doctrine lead to the conclusion that the facts contained in the record before us did not support the inter vivos distribution plan proposed by the petitioner under that doctrine.

■ With regard to the payment of attorney's fees, Mental Hygiene Law § 77.07 (d) provides that upon the award of a conservatorship, "the court may award reasonable counsel fees to the attorney for the petitioner and a reasonable allowance to a guardian ad litem appointed to represent the proposed conservatee payable out of the funds of the conservatee."

Appellant contends that *Matter of Potts* (213 App Div 59, *affd* 241 NY 593) and *Matter of Freeman* (34 NY2d 1), relied upon by the respondent guardian, are inapposite, as dealing with Surrogate's Court matters. Appellant, however, also contends that since 1925 and *Matter of Potts,* "there has been no considered appellate guidance on how New York State courts should determine reasonable fee awards" and, more particu-

larly, that there is no standard for determining "reasonable fees" in conservatorship matters. Thus, appellant urges this court to establish a new standard for the determination of fees based on the Federal "lodestar" methodology. Under this analysis, a fee is based on time expended multiplied by an appropriate hourly rate. This lodestar is then adjusted upward or downward to take into consideration extraordinary circumstances, such as the results achieved, the novelty of the issue, and other factors. This standard is currently applied to requests brought under the Civil Rights Attorney's Fees Awards Act of 1976 (42 USC § 1988). *(See, Hensley v Eckerhart,* 461 US 424.)

Contrary to appellant's contention, the law in New York relating to attorney's fees in this area is clear. The principles enunciated in *Matter of Potts (supra)* are applicable to conservatorships and other attorney fee matters involving the discretion of the court, not only Surrogate's Court matters. The Fourth Department, there, said in part: "In general the court, in determining the justice and reasonableness of an attorney's claim for services, should consider the time spent, the difficulties involved in the matters in which the services were rendered, the nature of the services, the amount involved, the professional standing of the counsel, and the results obtained" *(Matter of Potts, supra,* 213 App Div, at 62).

The Court of Appeals has restated the factors as follows: "Long tradition and just about a universal one in American practice is for the fixation of lawyers' fees to be determined on the following factors: time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer's experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved." *(Matter of Freeman,* 34 NY2d 1, 9, *supra.)*

Even a cursory investigation reveals that the Federal courts in awarding fees under 42 USC § 1988, while perhaps more rigid in certain respects, apply basically the same time-honored factors. Thus, the United States Supreme Court has noted with respect to that statute that the legislative history indicated an intent to have the amount of the fee determined by 12 factors: (1) the time and labor required; (2) the novelty

and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases *(Hensley v Eckerhart, supra,* at 430, n 3).

Appellant notes the widespread mandatory rule in many of the Federal circuits that contemporaneously maintained time records are a prerequisite for the recovery of fees under section 1988 *(see, New York State Assn. for Retarded Children v Carey,* 711 F2d 1136, 1147). However, we decline to adopt such a hard and fast rule that reconstructed time records can never serve as a basis for compensation, or that such detailed time records are necessary in every case regardless of the amount of the estate involved. "To base a fee solely on hours worked is to penalize the experienced and skillful lawyer who can perform the services in substantially less time than the inexperienced one" (Pasley, *Trusts and Administration,* 23 Syracuse L Rev 239, 261 [1972]). We note, however, that the burden of showing the "reasonableness" of the fee lies upon the claimant *(Matter of Potts, supra,* at 61) and the court will usually, and especially in a matter involving a large fee, be presented with an objective and detailed breakdown by the attorney of the time and labor expended, together with other factors he or she feels supports the fee requested.

Accordingly, the order and commission to conservator, entered November 19, 1987 and January 27, 1988, respectively, which, *inter alia,* granted a commission to petitioner as conservator of her husband's estate, should be modified, on the law and facts, solely to the extent of remanding this matter to the Supreme Court, before another Justice of that court, for the fixation of fees payable to the attorney for petitioner and the guardian ad litem, and otherwise affirmed, without costs or disbursements.

CARRO, J. P., MILONAS and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on November 19, 1987, and order (denominated a commission) of

said court entered on January 25, 1988, unanimously modified, on the law and facts, solely to the extent of remanding this matter to the Supreme Court, before another Justice of that court, for the fixation of fees payable to the attorney for the petitioner and guardian ad litem, and otherwise affirmed, without costs and without disbursements.