OPINION OF THE COURT
Lorraine S. Miller, J.
Claire Spingarn (Claire) is a 95-year-old remarkable woman, who has lived alone since the death of her third husband several years ago. She has substantial assets, consisting of high grade stocks and bonds (many are municipal issues in "bearer” form).
Her small, rent-stabilized apartment is in an upper East Side luxury building. Meals are delivered by "Meals on Wheels” during the week which she supplements by frequenting the local restaurants. She takes her laundry to the local laundromat and has been relatively self-sufficient. Despite her wealth, she lives simply and expresses concern about any wasteful dissipation of her resources.
Claire’s family consists of a 70-year-old unmarried son, a California resident, and an unmarried daughter, a New York City resident and former bank officer.
A large firm of attorneys was retained by the son and daughter to have the latter appointed as guardian under article 81 of the Mental Hygiene Law. (Mental Hygiene Law § 81.02, eff Apr. 1, 1993, L 1992, ch 698, § 6.) No written retainer agreement was executed. This court is concerned by both the amount of the legal fees requested as well as the method of calculating such fees.
A court evaluator appointed by another Judge of this court confirmed Claire’s inability to manage her financial affairs and her need for assistance. Additionally, while she is amazingly spry and functions better than persons many years her junior, she suffers from occasional memory loss and spasmodic speech aphasia. Occasionally she fantasizes about having young children which sends her out into the building’s corridors and public streets at odd hours in search of them. She has also failed in the past to get some needed medical assistance.
Claire retained counsel to oppose her daughter’s appointment as guardian because of long-standing antipathy between them and to oppose the broad powers sought by the daughter. While she was amenable to her son’s appointment, it became *893 apparent to this court and to him that his California residence made it infeasible and that Claire’s needs would be better met by the appointment of a local nonfamily member as guardian. The court held both an informal meeting and a formal hearing in compliance with the statute. Claire was present on both occasions, as well as her two children, all attorneys, the court evaluator and a physician. Claire was very articulate and coherent about her wishes. The court on June 6, 1994 appointed a knowledgeable, compassionate attorney as guardian and fashioned an order tailored to Claire’s personal and property-management needs. (It has worked out very well indeed. The guardian appointed by this court visits Claire regularly, arranged for an eye examination, a new refrigerator, household help and has put Claire’s financial affairs in order. Measures have also been instituted to prevent the midnight wanderings in search of the errant "children” and to quiet the landlord who has been seeking possession of the apartment. Claire appears happy with the situation for she has retained her independence.)
Clearly the petitioners benefitted their mother by bringing the petition. The quality of her life has been tremendously improved. However, the fee originally requested by their attorneys cannot be approved by this court and merits examination and discussion.
The new article 81, effective in April 1993, has many desirable goals. This case is an example of one in which the functional needs of an elderly person were examined and are happily being met. However, it has become apparent to this court that where there is an estate of some size, an unintended result has been to create a "cottage industry” with fees for evaluators, fees for petitioner’s attorneys, fees for geriatric social workers and physicians, and fees for an attorney for the alleged incapacitated person, if, as here, she has retained one. How should such fees be measured? At what rate? What disbursements are justified?*
In Matter of Potts (213 App Div 59, lv denied 241 NY 510, affd 241 NY 593), the Appellate Division, Fourth Department, said, in part, that a court in determining the reasonableness of an attorney’s fee claim should consider the time spent, the *894 difficulties involved, the nature of the services, the amount involved, the professional standing of counsel and the results obtained. The Court of Appeals in Matter of Freeman (34 NY2d 1, 7 [1974]) restated the same guidelines but reminded us that the profession of law "is not a business” for it "impos[es]” on its members, inter alia, "a code of ethics imposing standards qualitatively and extensively beyond those that prevail or are tolerated in the marketplace”.
The evaluation of what constitutes reasonable counsel fees has consistently been held to be a matter within the sound discretion of the court (see, DeCabrera v Cabrera-Rosete, 70 NY2d 879 [1987]; Lefkowitz v Van Ess, 166 AD2d 556 [2d Dept 1990]; Shrauger v Shrauger, 146 AD2d 955 [3d Dept 1989]; Matter of Karp, 145 AD2d 208 [1st Dept 1989]; Matter of Von Hofe, 145 AD2d 424 [2d Dept 1988]) and the cutting of fees claimed is a proper exercise of discretion as well (Matter of Ury, 108 AD2d 816 [2d Dept 1985], lv denied 64 NY2d 611 [1985]; Matter of Brehm, 37 AD2d 95 [4th Dept 1971]).
The operative standard to be applied in New York in determining an appropriate award of counsel fees is the fair and reasonable value of the services rendered.
In Matter of Rahmey v Blum (95 AD2d 294 [2d Dept 1983]) former Appellate Division Justice Isaac Rubin enunciated the following four-step "analytical framework” within which counsel fees should be evaluated:
(a) Hours reasonably expended
Noting that hours claimed by an attorney need not be automatically accepted and if inadequately documented should be discounted. In discussing the manner in which a court should evaluate a claim for hours expended, that court suggested the following formula: (1) Hours which reflect inefficiency or duplication of services should be discounted; (2) Hours that are excessive, unnecessary or which reflect "padding” should be disallowed; (3) Legal work should be differentiated from nonlegal work such as investigation, clerical work, the compilation of facts and other types of work which can be accomplished by nonlawyers who command lesser rates; (4) Time spent in court should be differentiated from time expended for out-of-court services; and (5) The hours claimed should be weighed against the court’s own knowledge, experience and expertise as to the time required to complete similar activities. (Matter of Rahmey v Blum, supra, at 300-301.)
In order to adequately and fairly apply the foregoing factors, the counsel fee application must be accomplished by *895 sufficiently detailed time records (see, Matter of Slade, 99 AD2d 668 [4th Dept 1984]; Matter of Ury, 108 AD2d 816, supra; Matter of Schaich, 55 AD2d 914 [2d Dept 1977], lv denied 42 NY2d 802 [1977]; Jordan v Freeman, 40 AD2d 656 [1st Dept 1972]). As the court held in Krear & Co. v Nineteen Named Trustees (810 F2d 1250, 1265 [2d Cir 1987]): "The burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested.”
(b) Reasonable hourly rate
The next step in determining attorney’s fees is to arrive at a reasonable hourly charge for each category of services rendered. (Matter of Rahmey v Blum, supra, 95 AD2d, at 302.) The Court stated: "[T]he reasonable hourly rate should be based on the customary fee charged for similar services by lawyers in the community with like experience and of comparable reputation to those by whom the prevailing party was represented (see Johnson v Georgia Highway Express, [488 F2d 714 (5th Cir 1974)]; Northcross v Board of Educ., [611 F2d 624, 638, cert denied 447 US 911]). Experience includes not only the number of years of practice but also the nature of the practice engaged in”. (Emphasis supplied.)
Thus, the hourly rate charged by an attorney will normally reflect the training, background, experience and skill of the individual attorney. (There was no recitation regarding any of these attorneys in the fee application submitted that would justify the rates at which they billed.)
Additionally, in this court’s view, time spent in court on a matter should be billed in a very different way and rate from time spent in the attorney’s office, speaking on the telephone with Claire’s doorman, for example, or drafting a memo to the file or to an office associate who also bills simply for reading it.
(c) Computation of fee
The third step is to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate.
(d) Adjustments to fee
The initial lodestar estimate, which is predicated on an objective assessment of reasonableness, may be reduced by the court based on the following factors: "(1) the novelty and *896 difficulty of the questions presented; (2) the skill requisite to perform the legal services properly; (3) the preclusion of other employment by the attorney due to acceptance of the case; (4) whether the fee is fixed or contingent; (5) time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the amount involved and the results obtained; (8) the undesirability of the case; and (9) awards in similar cases.” (Matter of Rahmey v Blum, supra, at 303-304; Matter of Karp [Cooper], 145 AD2d 208 [1st Dept 1989].)
Initially, the petitioners’ attorneys submitted only a narrative recitation of their services in support of their application. The court requested more specificity detailing time expended for each activity as well as the person performing said activity and the rates charged. The supplemental affirmation and time sheets revealed that one partner had billed at $415 per hour, two partners at $395 per hour, one associate at $240 per hour, two senior associates at $230 and $220 per hour, etc. The end result was a total of 230 hours billed on a relatively simple matter.
The court noted that when two or more partners and/or associates conversed in person or by telephone in the same office, all billed for their time. Internal memos drafted by one to another in the same firm were similarly billed although their offices were physically in close proximity.
Each person in the firm who read the evaluator’s report billed. Extensive hours were billed reviewing proposed powers for the guardian; the petition to the court to appoint a guardian was drafted and then redrafted many times (which was unnecessary if drafted initially by an attorney with expertise). (See, Pitulla, Truth in Billing, 78 ABA J 120.) Although discussions regarding and reviewing tax returns were billed, no attorney ever applied for an extension of time to file Claire’s 1993 tax return.
When one or more of the attorneys did "research”, that time was also billed many times although this court is of the opinion, perhaps naively, that a professional is and should be responsible for his or her own continuing education, keeping abreast as other professionals in New York and attorneys in many other States are mandated to do. As the guardian herein pointed out in objections filed by her: "Attorneys involved in this area of the law have been attending several Bar Association programs for many months so as to acquire *897 expertise without billing the clients for 'study time’ A client who retains an attorney has the right to expect that the attorney has the required expertise or will not accept the case. Acquiring such expertise should not be at a client’s expense which thereafter surfaces on the bill without prior discussions with the client and agreement thereto.
At the first informal meeting held by this court with everyone involved, two attorneys inexplicably appeared for the petitioners. The presence of one was sufficient for the second one did not even speak and made no contribution. It has never been satisfactorily explained to this court why the petitioners’ attorneys thought it necessary or proper to have so many attorneys, paralegals and clerical involved in this relatively simple matter.
Claire retained her own counsel after being served with the petition herein only because she objected to the appointment of her daughter as her guardian and because she did not want to be moved from her apartment to some facility chosen by her children. The objections filed by the attorney she retained admitted that she needed assistance with her extensive finances (that was never an issue to be litigated). The appointment of a guardian with limited powers tailored to her personal needs was all that was required and was accomplished by this court with a minimum of difficulty, and with highly successful results. A careful reading of the papers herein convinces the court that there was too much time spent and wasted on nonissues and on mere telephone calls, all billed at extremely high rates. The alleged incapacitated person’s (AIP) assets should not be charged with the time involved for such matters. Moreover, the petitioners had an obligation to ascertain, in advance, how the time was being spent and how it would be billed to their mother. It was wrong for them and their attorneys to just assume that Claire would be responsible for it all. (See, Model Rules of Professional Conduct rule 1.5.)
In this case relatively little in-court time was invested, the questions were neither novel nor difficult, petitioner attorneys were not precluded from accepting other clients and the length of the litigation was not prolonged since the AIP’s attorney readily admitted she needed assistance but she simply did not want her daughter.
In sum, the services rendered by petitioners’ numerous attorneys did not call for special skills or major talents and *898 could have been handled with equal dispatch and diligence by any attorney who had taken the widely offered course provided by all of the local bar associations.
Since this court believes that many of the 230 hours billed by several partners and associates were unnecessary, duplicative and not the responsibility of the AIP, this court will allow only a reduced legal fee of $32,500, based upon the court’s experience and analysis of the time reasonably involved in preparing, processing and presenting the petition to the court. The guardian is directed to pay that sum to the attorneys for the petitioners.

 Mental Hygiene Law article 81 fails to make any provision for the payment of guardians, evaluators, etc., where the alleged incapacitated person has no assets. (See, letter to the NYLJ by this court on June 7, 1994, at 2, col 5, urging remedial legislation which has now been introduced by Assemblyman Ed Griffith, 1995 NY Assembly Bill A5704.)