BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., et al., Plaintiffs,

v.

PHILIP MORRIS, INCORPORATED, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Liggett Group, Inc., Lorillard Tobacco Company, British American Tobacco, Ltd. Defendants.

No. 98 CV 3287(JBW).

United States District Court, E.D. New York.

Feb. 28, 2002.

Dewey Ballantine LLP, New York, By Paul J. Bschorr, Esq., Vincent R. Fitz-Patrick, Jr., Esq., Michael Hefter, Esq., Heather K. McDevitt, Esq., Dewey Ballantine LLP, Washington, DC, By Martha J. Talley, Esq., for Plaintiffs Blue Cross, et al.

Arnold & Porter, Washington, DC, By Murray R. Garnick, Esq., Sedgwick, Detert, Moran & Arnold, San Francisco, CA, By Kevin J. Dunne, Esq., Sedgwick, Detert, Moran & Arnold, New York, By James T. Conlon, Esq., for Defendant Philip Morris, Incorporated.

Sedgwick, Detert, Moran & Arnold, New York, By David M. Covey, Esq., Kirkland & Ellis, Washington, DC, By Kenneth N. Bass, Esq., for Defendant Brown & Williamson Tobacco Corporation.

Greenberg Traurig, LLP, New York, By Alan Mansfield, Esq., Shook, Hardy & Ba-con, LLP, Kansas City, MO, By Gary R. Long, Esq., for Defendants Lorillard Tobacco Company, Lorillard, Inc.

Debevoise & Plimpton, New York, By Steven Klugman, Esq., for Defendant Council for Tobacco Research, U.S.A., Inc.

Jacob, Medinger & Finnegan, LLP, New York, By Barry S. Schaevitz, Esq., for Defendant Smokeless Tobacco Council, Inc.

Womble, Carlyle, Sandridge, & Rice, PLLC, Atlanta, GA, By R. Dal Burton, Esq., Womble, Carlyle, Sandridge, & Rice, PLLC, Winston–Salem, North Carolina 27102, By Thomas D. Schroeder, Esq., Ursula M. Henninger, Esq., Collier, Shannon, Rill, & Scott, PLLC., Washington D.C., By John B. Williams, Esq., for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Chadbourne & Parke LLP, New York, By Thomas J. McCormack, Esq., for Defendant British American Tobacco (Investments) Limited (formerly known as British–American Tobacco Company Limited).

Simpson Thacher & Bartlett, New York, By Joseph McLaughlin, Esq., for Defendant BAT Industries P.L.C.

Davis & Gilbert, LLP, New York, By Bruce M. Ginsberg, Esq., for Defendant Hill & Knowlton, Inc.

Kasowitz, Benson, Torres & Friedman LLP, New York, By Leonard Feiwus, Esq., for Defendants Ligget Group Inc., Ligget & Myers, Inc., and Brooke Group Ltd.

Seward & Kissel, New York, By Anthony R. Mansfield, Esq., for Defendant The Tobacco Institute, Inc.

### *MEMORANDUM, ORDER AND JUDGMENT*

WEINSTEIN, Senior District Judge.

Table of Contents
I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
II. Factual and Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
III. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
 1. Policy supporting allowing fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
 2. Statutory authorization of attorney's fee awards . . . . . . . . . . . . . . . . . . . . . . . . . . .17
 3. Procedural considerations in awarding attorney's fees . . . . . . . . . . . . . . . . . . . . . .17
 4. Federal Law on attorney's fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
 5. New York State Law on Attorney's Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
IV. Findings of Fact and Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

## I. Introduction

Plaintiff applies for attorneys' fees based on the recovery from defendants of a judgment in the sum of $18,436,034 including prejudgment interest, from a jury verdict pursuant to section 349 of the New York Business Law. Motions to set aside the verdict were denied. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 178 F.Supp.2d 198 (E.D.N.Y.2001). For the reasons indicated below fees are awarded in the amount of $37,841,054.22.

## II. Factual and Procedural Background

This and related litigation have been extensively described. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 178 F.Supp.2d 198 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* No. 98–CV–3287, 2001 WL 1328414 (E.D.N.Y. Sept. 27, 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* No. 98–CV–3287, 2001 WL 1328458 (E.D.N.Y. Sept. 17, 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* No. 98–CV–3287, 2001 WL 811930 (E.D.N.Y. May 22, 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 141 F.Supp.2d 320 (E.D.N.Y. 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 138 F.Supp.2d 357 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 133 F.Supp.2d 162; *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 199 F.R.D. 487 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 199 F.R.D. 484 (E.D.N.Y. 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 113 F.Supp.2d 345 (E.D.N.Y.2000); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 53 F.Supp.2d 338 (E.D.N.Y.1999); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 36 F.Supp.2d 560 (E.D.N.Y. 1999); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* No. 98–CV–3287, 1999 WL 104815 (E.D.N.Y. Feb. 25, 1999). For related tobacco litigation in this court, *see Simon v. Philip Morris Inc.,* 200 F.R.D. 21 (E.D.N.Y.2001); *Simon v. Philip Morris Inc.,* 124 F.Supp.2d 46 (E.D.N.Y.2000); *Simon v. Philip Morris Inc.,* No. 99–CV–1988, 2000 WL 1658337 (E.D.N.Y. Nov.6, 2000); *Simon v. Philip Morris Inc.,* 194 F.R.D. 73 (E.D.N.Y.2000); *Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95 (E.D.N.Y.2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.,* No. 98–CV–1492, 2001 WL 477256 (E.D.N.Y. Feb.27, 2001); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.,* No. 98–CV–1492, 2000 WL 1424931 (E.D.N.Y. Sept.26, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.,* No. 98–CV–1492, 2000 WL 1364358 (E.D.N.Y. Sept.20, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.,* No. 98–CV–1492, 2000 WL 777834 (E.D.N.Y. June 13, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.,* 86 F.Supp.2d 137 (E.D.N.Y.

2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 71 F.Supp.2d 139 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 74 F.Supp.2d 221 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 74 F.Supp.2d 213 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 23 F.Supp.2d 321 (E.D.N.Y.1998); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, No. 98–CV–1492, 1998 WL 372410 (E.D.N.Y. July 2, 1998); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1880303 (E.D.N.Y. Dec. 27, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1880305 (E.D.N.Y. Dec. 27, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1804542 (E.D.N.Y. Dec. 4, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1804602 (E.D.N.Y. Nov. 30, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1737941 (E.D.N.Y. Nov. 21, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1370437 (E.D.N.Y. Sept. 21, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1336697 (E.D.N.Y. Sept. 15, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1292671 (E.D.N.Y. Sept. 8, 2000); *Falise v. Am. Tobacco Co.*, 107 F.Supp.2d 200 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1144697 (E.D.N.Y. July 25, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1010982 (E.D.N.Y. July 19, 2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 1010978 (E.D.N.Y. July 18, 2000); *Falise v. Am. Tobacco Co.*, 94 F.Supp.2d 316 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 433097 (E.D.N.Y. Apr.18, 2000); *Falise v. Am. Tobacco Co.*, 91 F.Supp.2d 525 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 2000 WL 264332 (E.D.N.Y. Jan. 24, 2000) (Nos.CV–98–1492, CV–97–7658, CV–98–3287, CV–98–675); *Falise v. Am. Tobacco Co.*, 193 F.R.D. 73 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, 241 B.R. 63 (E.D.N.Y.1999); *Falise v. Am. Tobacco Co.*, 241 B.R. 48 (E.D.N.Y.1999); *Falise v. Am. Tobacco Co.*, No. 99–CV–7392, 1999 WL 98626 (E.D.N.Y. Feb. 18, 1999) (Nos.97–CV–7640, 97–CV–7658, 98–CV–675); *Falise v. Am. Tobacco Co.*, No. 97–CV–7640, 1998 WL 372401 (E.D.N.Y. July 2, 1998); *Bergeron v. Philip Morris Inc.*, 100 F.Supp.2d 164 (E.D.N.Y.2000); *Bergeron v. Philip Morris Inc.*, No. 99–CV–6142, 2000 WL 748144 (E.D.N.Y. June 8, 2000); *H.K. Porter Co., Inc. v. Am. Tobacco Co.*, 71 F.Supp.2d 73 (E.D.N.Y. 1999); *In re Tobacco Litig.*, 193 F.R.D. 92 (E.D.N.Y.2000); *In re Tobacco Litig.*, 192 F.R.D. 90 (E.D.N.Y.2000); *In re Simon II Litigation*, 172 F.Supp.2d 375 (E.D.N.Y.2001); *In re Simon (II) Litig.*, Nos. 00–CV–5332, 98–CV–0675, 99–CV–6142, 98–CV–1492, 97–CV–7658, 99–CV–1988, 98–CV–3287, 99–CV–7392, 2000 WL 1252182 (E.D.N.Y. Sept.6, 2000).

In April 1998, numerous Blue Cross health plans from across the nation, including New York's Empire Blue Cross and Blue Shield ("Empire") filed suit against the major tobacco companies to recover the extra money they were forced to spend on patients harmed by tobacco as a result of alleged fraud by defendants. The legal and factual issues were significant to the parties and to society. The stakes were such as to warrant comprehensive presentation by the best attorneys available to plaintiff and to defendants. Plaintiffs sought some $10 billion in damages, subject to trebling. The case also was potentially important as a precedent.

This litigation was labor-intensive, time-consuming, and involved daunting legal and factual issues. Defense counsel were

highly experienced in tobacco litigation. Their skills and grasp of the facts and theory had been honed in related complex litigation successfully defended in many suits across the country.

After a national search for qualified counsel, the group of Blue Cross / Blue Shield plans, including Empire, retained Dewey Ballantine LLP ("Dewey") in March 1998 to represent them in this action. The Agreement for Professional Services provided for various levels of fees to be paid to Dewey. A portion of the fees was structured as an incentive or contingency arrangement, labeled the "Success premium." This arrangement was in part a standard contingency fee, allowing Dewey a portion of any recovery. The contingency percentages were higher if the judgement was higher. Potential fees under the agreement were sizeable. If plaintiffs were awarded more than approximately $4.5 billion of the $10 billion claimed, the fee was to be $185 million. For smaller awards, fees were less, both because they were percentages of a smaller gross, and because the percent applied was smaller.

If fully successful, the suit would have resulted not only in a huge verdict in the instant case, but a threat to the economic viability of defendants in other suits based on the litigation template plaintiff's counsel would have created. The policy of New York state in encouraging such quasi-attorney general suits to deter fraud on consumers would have been uniquely vindicated.

The court closely observed plaintiff's counsel and was able to obtain a good sense of its efforts in preparation, in depositions, and in court. *See, e.g., Blue Cross,* 178 F.Supp.2d at 253–55. Dewey tried this case with uncommon skill. So too did counsel for defendants.

The Dewey core trial team included four partners, each with more than 26 years of experience, plus junior partners and associates. One senior partner is a former Chair of the Litigation Section of the American Bar Association and has been involved in numerous business and commercial litigations. Two have extensive experience in complex commercial litigation. Another partner practiced law at the Department of Justice and assisted the United States Senate and the United States House of Representatives in key matters.

Litigation was extensive, lasting over three years and consuming 44 trial days. The amount of time devoted to the case was appropriate because of the nature of the case and the complex issues involved at the trial. *See Blue Cross,* 178 F.Supp.2d 198 (detailing extensive nature of trial). The trial required 34 witnesses, 10 of whom were Daubertized—*Daubert* screened experts; there were 1,632 demonstratives and exhibits, and over 100 depositions utilized in court.

The effort plaintiff's counsel put into the case was fully warranted. Extensive use of paraprofessionals to reduce costs was appropriate. Briefing and arguments were extensive, but were required by the nature of the litigation. Dewey traveled throughout the country, representing Empire at over 300 subscriber video depositions, many of which appropriately were heard at trial. It deposed 29 of the defendants' executives and employees. The parties filed over 150 legal memoranda and argued many of these applications. The docket sheet contains over 1400 entries. Computer technicians were able to quickly access data, diagrams, charts and depositions and display them on a huge screen for the jury. The parties used questionnaires, surveys, statistical evidence and modeling, and other advanced and often

novel but appropriate statistical techniques. Reproduction of hundreds of thousands of pages of documents from Empire's files for the many defense counsel and the court was needed.

Plaintiff alleged a number of claims including antitrust, conspiracy, RICO, New York Consumer Protection Act ("Act"), and common law fraud. A continuing conspiracy was proved for evidentiary purposes, warranting evidence both before and after 1980—the effective date for the litigation of the Act—with damages based solely on post 1980 actions of defendants and reliance by smokers. The jury verdict established, apparently for the first time, that the tobacco industry had engaged in statutorily banned deceptive practices harming a third party payor and its subscribers. The jury returned a verdict of $17 million for the plaintiff on the claim under section 349 of the General Business Law and just over $11 million on a subrogated claim under section 349. The other claims were unsuccessful.

On September 19, 2001, Dewey filed a motion for award of attorney's fees under section 349(h) of the New York General Business Law. Plaintiffs originally sought $39,086,223. This figure reflected 144,256.67 hours of necessary legal work, which is an average rate for partners of $271 per hour, somewhat less than those of comparable New York law firms. Excluded from this amount was work performed by anyone billing less than 50 hours for the matter and law clerks, summer associates, and law librarians.

Dewey kept contemporaneous time records and was conservative. For example, it included only half of the total time for conferences between the firm and its client throughout the representation.

In preparation for the motion for attorneys' fees the court issued a memorandum and order setting guidelines for argument and suggesting criteria for setting the fee. *See Blue Cross*, 2001 WL 1328414 at *1–*2 (Sept. 27, 2001). An evidentiary hearing was scheduled. Plaintiff submitted and supplemented affidavits supporting its application for over $39 million in fees. The parties were allowed ample time for full discovery on the question of fees. Voluminous attorney time sheets were entered into evidence.

Defendants did not accept the suggestion that they cross-examine the affiants or submit evidence of their own. They agreed not to challenge the reasonableness of the hours expended or the hourly rates charged. *See* Defendants' Motion of Dec. 21, 2001 at 33–34. The parties agreed not to place on the record the fees charged by defense counsel to their clients—which the court estimates were substantially in excess of plaintiff's claims.

## III. Law

This section includes 5 parts: (1) The policy supporting allowance of legal fees; (2) statutory authorization of attorney's fees; (3) the law on certain procedural questions; (4) Federal law on attorney's fees; and (5) state law on attorney's fees.

### 1. Policy supporting allowing fees

█ The basic rule regarding attorney's fees is "the general 'American Rule' that the prevailing party may not recover attorney's fees as costs or otherwise." *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 245, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). This contrasts with the system in England, where "for centuries...there has been statutory authorization to award costs, including attorney's fees[.][C]ounsel fees are regularly allowed to the prevailing party." *Id.* at 247, 95 S.Ct. 1612; *cf. id.* at n. 18 (extensive history of English rule, including that

fees in England have been allowed to defendants since 1278 and plaintiffs since 1607); *id.* at 248–54, 95 S.Ct. 1612 (ad hoc United States jurisprudence on the issue prior to establishment of the American rule in 1853, the enactment of a statute in 1853 establishing the American rule, and the later court decisions enforcing the American rule); 28 U.S.C. §§ 1920, 1923 (2001) (successor sections to the 1853 act, allowing costs to include only certain small docket fees). Costs and disbursements allowed in the United States originally closely approximated actual legal fees as in England, but inflation and a failure to adjust these fees have now resulted in their being largely nominal. *See* Harold L. Korn *et al., New York Civil Practice* ¶¶ 8101.17; 8201.03; 8301.01; 8301.04 (1995) (history of costs and disbursements, including the fact that they now bear little resemblance to actual litigation costs). There is now a slight tendency towards adoption of the English system in the United States, as reflected in this memorandum, Rule 11 of the Federal Rules of Civil Procedure and various statutes listed below.

There are a few exceptions under common law to the American rule. The losing party may be compelled to pay attorney's fees where there is bad faith, or under a common law theory of "common benefit." *Alyeska,* 421 U.S. at 245, 95 S.Ct. 1612. United States courts have been reluctant to expand any common law right to attorney's fees, concluding that it is "inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in [this] manner[.]" *Id.* at 247, 95 S.Ct. 1612.

To recover attorney's fees in the United States, a party must generally be authorized by a statute to do so. There are a number of Federal statutes or causes of actions which allow attorney's fees to be awarded in some cases. These include Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g)(1) (2001); antitrust statutes. 15 U.S.C. § 4304 (2001); trademark laws, 15 U.S.C. § 1117 (2001); copyrights, 17 U.S.C. § 505 (2001); the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 (2001); the Fair Labor Standards Act, 29 U.S.C. § 216 (2001); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626(b) (2001); and the Americans with Disabilities Act, 42 U.S.C. § 12205 (2001). In addition, attorney's fees for Consumer Act suits brought under New York state law may be recovered under section 349(h) of New York General Business Law which provides that "[a] court may award reasonable attorney's fees to a prevailing plaintiff." N.Y. Gen. Bus. Law 349(h) (Consol.2001). (This section is discussed in some detail in section III.5, infra.)

Allowing fees in lawsuits introduces an added element of financial risk for the parties. Attorney fee statutes add the possibility of high legal fees—possibly higher than the ultimate award—which may act as a deterrent to parties who might otherwise bring a suit or defend one. The American legal system is not designed to minimize or balance all risks in litigation; for example, the risk of incurring legal costs in a frivolous suit is placed on the plaintiff, because we wish to discourage frivolous suits. *See, e.g.,* Fed. R.Civ.P. 11 (sanctions allowed for unnecessary, harassing or frivolous pleadings). For appropriate suits, statutes allowing plaintiffs to recover attorney's fees can mitigate some of the risk to them of litigation.

The risk reduction to plaintiffs is made by increasing the potential gain for a successful suit. A general formula for plaintiff's potential gain in any given suit under the American rule (ignoring the minimal

taxable costs and disbursements allowed the victor) might be superficially described as:

[ (percent chance of success) × (likely award) ]—cost of conducting litigation.

If that formula results in a positive number, it is rational for a plaintiff to bring suit. (There may also be independent business reasons, as for example to demonstrate to copyright violators that a violation will be prosecuted as a deterrent).

The effect of a statute allowing for attorney's fees to be shifted to the defendant is to modify the equation as follows:

[ (percent chance of success) × (likely award) ]—[ (legal fees element of cost of conducting the litigation) × (chance of loss) ]—other costs of conducting litigation.

This equation is more likely to result in a positive number, because the cost to a plaintiff of conducting the litigation is less of a negative in the equation, that is to say, less of a deterrent.

Fee-shifting statutes favoring plaintiffs are most effective in modifying the calculus for lawsuits worth bringing on their merits. The introduction of the new variable has a large effect if the chance of loss is small (only 10%, for example) which would probably be considered a lawsuit worth pursuing. Where chance of loss is higher, the effect of the statute is reduced. For example, if the chance of loss is 90% or more—a prototypical frivolous lawsuit—the fee statute will have a substantially reduced effect. When there is added to the risk to plaintiff the possibility of awarding defendants their fees for a frivolous suit brought against them, the pressure on a plaintiff not to bring actions without good cause increases substantially, and in effect the English system is imposed.

Assuming the plaintiff's case meets the very low standard of non-frivolousness, statutory fee awards obviously encourage the plaintiff (treating the plaintiff and his lawyer as one economic entity for purposes of this analysis) to sue and to demand settlement at a higher level since the total net recovery will be greater if the plaintiff obtains a judgment. Since the defendant will not collect statutory fees if it wins (again assuming minimum standards of suit viability), the cost of settlement will go up because the potential loss is greater.

Calculations become more complex when the benefits and detriments are analyzed separately for the client and the attorney, whose interests are not the same. They will also be affected by a judgment on how the court will exercise its fee-granting discretion.

The probability of settlement will not in general be increased by the availability of statutory fees because plaintiffs' willingness to settle at a figure that would have been appropriate without the statutory fee will be reduced. To settle plaintiff will demand more. *Cf.* Hans Zeisel, Harry Kalven, Jr., and Bernard Buchholz, *Delay in the Court* 111–19 (1959) (effect of delay on settlement). The psychological realities may actually reduce the chances of settlement should the defendant, for example, resent the added toll the law imposes on the damages actually caused by it, or should it wish to discourage future, more costly suits. By contrast, here plaintiffs might have sued in part to discourage defendants from leading its insureds into smoking—as a kind of a legal-medical prophylactic for diseases caused by smoking. Like sophisticated factors may have impacts on litigation different from that to be expected from a superficial economic analysis. In general, however, the net effect of a statutory change permitting plaintiffs, but not defendants, to obtain legal fees is

to increase the cost to possible malefactors and to encourage suits against them—the apparent design of the legislature.

There are several policy reasons suggesting why attorney's fees might be appropriately awarded in particular cases. In some cases, awards of one side's attorney's fees can have the effect of punishing a losing party. *Cf.* John T. Noonan, *Persons and Masks of the Law* 136–44 (1976) (commenting on the de facto punishment in the 1928 decision by the New York Court of Appeals which required Helen Palsgraf, whose annual income was $416, to pay costs of $350 to victorious defendant Long Island Railroad, which had millions in assets). In such cases, fee-shifting serves to discourage suit.

Another objective is to encourage suit. For example, in the last thirty years, courts have sometimes awarded fees under a "private attorney general" theory that "worthy claimants should not be discouraged from asserting rights embodying important public interests because of a lack of financial resources." *Incarcerated Men of Allen County Jail v. Fair*, 507 F.2d 281, 285 (6th Cir.1974). Since the Supreme Court's decision in *Alyeska*, courts have been discouraged from allowing fees under a "private attorney general" theory except when authorized by legislation. The rationale behind this approach is similar to that embodied in decisions requiring that litigants be allowed free access to court. *See, e.g., Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (state must waive filing fees for indigent applicants for divorce).

Private attorney general suits have the advantage to the state of reducing the burden on its underfunded prosecutorial staffs. Without private suits the state policy would not be enforced in many instances. An important example is *qui tam* suits based on frauds against the government.

*See, e.g.,* False Claims Act of 1986, Pub.L. 99–562, 100 Stat. 3153 (codified as amended at 31 U.S.C. §§ 3729–3733 (2001)) (authorizing qui tam enforcement in False Claims Act suits).

Another advantage of plaintiff attorney fee awards is that they serve to allocate costs in so-called "common fund" cases. *Alyeska*, 421 U.S. at 257, 95 S.Ct. 1612. In some jurisdictions, fees may be awarded where a party secures a "substantial benefit" to another party or to the public. *See generally Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977) (explaining substantial benefit cases).

### 2. Statutory authorization of attorney's fee awards

Rule 54 of the Federal Rules of Civil Procedure lays out the procedure for applying for attorney's fees. It states in relevant part that:

(d)(2)(A). Claims for attorney's fees and related non-taxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(d)(2)(B). Unless otherwise provided . . . the motion must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought.

Fed.R.Civ.P. 54.

Section 349(h) of Article 22–A of the New York General Business Law provides statutory authority for the award of attorney's fees in this case. This section contains language both creating liability and allowing the recovery of attorney's fees by plaintiffs. The applicable part of section 349 reads:

(h). In addition to the right of action granted to the attorney general ... any person who has been injured by reason of any violation of this section may bring an action is his own name to ... recover his actual damages[.] The court may award reasonable attorney's fees to a prevailing plaintiff.

N.Y. Gen. Bus. Law 349(h) (Consol.2001).

### 3. Procedural considerations in awarding attorney's fees

■ Courts may enter judgment on the merits and then rule on attorney fees or Rule 54 costs later. Rule 58 of the Federal Rules of Civil Procedure states that "[e]ntry of judgment shall not be delayed, nor the time for appeal extended, in order to tax costs or award fees." Fed.R.Civ.P. 58. A court may grant judgment before awarding attorney's fees and costs, since attorney's fees and costs are "wholly collateral" to a judgment on the merits. *FCC v. League of Women Voters*, 468 U.S. 364, 373–74, n. 10, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *accord* Fed.R.Civ.P. 54(d)(2)(B) (parties may seek attorney's fees after judgment has been issued by filing and serving a motion within 14 days after judgment is entered). Taxing of "costs" is also distinguished from the judgment on the cause of action. *See Buchanan v. Stanships, Inc.*, 485 U.S. 265, 268, 108 S.Ct. 1130, 99 L.Ed.2d 289 (1988) ("A sharp distinction between the judgment on the merits and an award of costs under Rule 54(d) also is evident in Rule 58's instruction that '[e]ntry of the judgment shall not be delayed for the taxing of costs.' Thus it is apparent that the Rules 'attemp[t] to divorce the process of entering judgment from that of determining and assessing the costs.'") (citing 10 Wright, Miller, & Kane, *Federal Practice and Procedure* § 2679, 392 (2d ed.1983)).

■ The actual award of attorney's fees may take place some time after entry of the main judgment. Rule 54(d) "imposes no time limit apart from an implicit requirement of reasonableness." *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 655 (7th Cir.1981), aff'd. on other grounds, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). *See also White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 454, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (permitting petitioner's request for attorney's fees under the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, four-and-a-half months after winning judgment on the merits).

In the instant case the parties postponed a hearing on the attorney fee issue to permit discovery on the matter to go forward. The present order awarding attorneys fees is timely.

### 4. Federal Law on attorney's fees

■ In federal court, state substantive statutes providing for attorney's fees are governed by state substantive law. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 52, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir.1992). *See also Erie R. Co. v. Tompkins*, 304 U.S. 64, 77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (federal courts should apply state substantive law where decision is based on state statute). Nevertheless, absent some overriding reason in policy or contrary state rulings, it is appropriate for federal courts to rely on federal practice in awarding fees under state substantive laws.

■ In computing fees due under a federal statute, courts generally use the "lodestar" method, following the court of appeals for the Third Circuit in *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir.1973). It is based on an initial

determination of hours expended multiplied by counsel's normal hourly rate. This number may then be modified to account for factors such as the quality or difficulty of the work. The court of appeals for the Fifth Circuit favored a separate test in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir. 1974), which required weighing of twelve factors in determining fees: The time and labor required, the novelty and difficulty of legal questions; the skill required to litigate the case; any preclusion of other employment from acceptance of the case; the customary fee if any; the fixed or contingent nature of the fee; any time limitations imposed on the attorney; the amount in controversy and the result obtained; the experience, reputation, and ability of the attorneys; the desirability or undesirability of the case; the nature and length of the professional relationship; and the awards allowed in similar cases.

The Supreme Court approved consolidation of the two standards in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *Hensley* states that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." 461 U.S. at 433, 103 S.Ct. 1933. Courts, however, are also encouraged to use the *Johnson* factors in determining reasonable hours and rates. *Id.* at 434 n. 9, 103 S.Ct. 1933. Lodestar calculations, widely used for federal statutes, provide useful reference points in calculating state fee amounts.

Applying controlling law, this court briefly examined the issue of fee awards under section 349 and issued the following memorandum to guide the parties in preparing to argue the fee issue:

In determining statutory fees under section 349 of New York's General Business Law, the following criteria may be considered:

(1) The fees allowed should be sufficient to attract excellent attorneys who will devote their full resources, appropriate to the case.

(2) Fees should not be so great as to encourage poor cases to be litigated or excessive resources dedicated to the job on the theory that defendants will be "compelled" to settle because of the threat of huge fees, or on the gamble that the large fee may be allowed in an occasional "successful" suit, overcoming losses when litigations fail.

(3) Fees should not be disproportionate to the probable value of the case. Probable value is reflected to a considerable degree in the reality of what was obtained in the actual suit.

(4) Cost of support to the lawyers by advice from experts, work of paraprofessionals technicians, and other resources is appropriate. These billable fee expenses must be distinguished from costs under Rule 54(d) of the Federal Rules of Civil Procedure. Expert fees for preparation of reports, depositions and testimony are not available as statutory fees.

(5) Generally, the fee should not be greater than counsel actually would earn were the case "successful" since it is compensation to the client for its potential out-of-pocket expenditures. The attorney's experience, ability and reputation should be considered in determining the fee that probably would have been earned. Where the recovery is relatively small or the contribution to the law is great this limit should not be observed.

(6) The fee should be reduced by a proportion that would not have been necessary had other theories not been incorporated in the suit. Leeway for imaginative use of other supporting theories should be allowed. The initia-

tive and imaginative expansion of the law by plaintiff's counsel should not be suppressed.

(7) Unnecessary inefficiency or wasteful overstaffing, or duplicative work should not be rewarded or encouraged. Legal research, writing, and litigation in a new field almost always will lead up some blind alleys and require backtracking; the fee should recognize this aspect of the lawyer's creative work.

(8) The hourly rate or percentage or recovery, or combination of the two, should not exceed the norm for the legal community (national, regional or local as may be appropriate).

(9) The specifics of any contingency or other fee arrangement with the client are not decisive but may be considered.

(10) An actual payment of attorneys' fees is not a condition precedent to a recovery.

(11) The work of opposing counsel and the fees they required in defense illuminates the reasonableness of plaintiff's counsel's requested fee.

(12) The trial court's experience with the case and similar cases bears on the award. A precise mechanical formulae is not possible. In general, the federal lodestar method, while not binding in state substantive law cases, is an acceptable and readily applicable method even in Erie cases. Moderation is desirable.

(13) In short, the court should attempt a melding of appropriate criteria, looking to the purpose of the statute at issue. It should consider the time and skill required in litigating the particular case, the complexity of the issues, the customary fee for the work, the results achieved, the lawyer's experience, ability and reputation, the amount in dispute, the potential benefit to the client, the benefit to society, and the responsibility assumed by the lawyer.

*Blue Cross,* 2001 WL 1328414 at \*1–\*2 (Sept. 27, 2001).

Set out below is some of the caselaw supporting this instruction to counsel. Throughout this section of law, the court is guided by the decision of the Second Circuit court of appeals in *Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47 (2d Cir.1992). That case examined in moderate detail the law under section 349. It is especially useful given the relative paucity of case law in New York State courts on application of section 349's attorney fee provisions. *Cf. McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 232 (1st Cir. 1980) ("To the extent [state] law is silent or incomplete on the calculation of attorney's fees, [federal law] may well be relevant."); *Riordan,* 977 F.2d at 53 (quoting language from *McGinty* that federal law can be used where state law is silent or incomplete). Since federal courts' experience in awarding legal fees is greater than that of state courts, it is appropriate to rely on federal decisions in applying state law. In addition to *Riordan,* a number of district courts in this circuit have examined section 349, and their decisions are helpful. See, e.g., *Indep. Living Aids, Inc. v. Maxi–Aids, Inc.,* 25 F.Supp.2d 127 (E.D.N.Y.1998); *Samara Bros., Inc. v. Judy–Philippine, Inc.,* 969 F.Supp. 895, 901 (S.D.N.Y.1997), *partially rev'd on other grounds,* 165 F.3d 120 (2d Cir.1998), *rev'd by* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *Schwartz v. Chan,* 142 F.Supp.2d 325 (E.D.N.Y.2001); *Wilson v. Car Land Diagnostics Ctr., Inc.,* 2001 WL 1491280 (S.D.N.Y. Nov.26, 2001).

*5. New York State Law on Attorney's Fees*

■ The general rule in New York is that attorney's fees are "merely incidents of litigation and thus are not compensable in the absence of statutory authority pro-

viding for such." *City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 262–63, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971). This is also the rule in federal courts. *See, e.g., Alyeska*, 421 U.S. 240, 269–71, 95 S.Ct. 1612, 44 L.Ed.2d 141. As already noted, in the present case, subsection (h) of New York General Business Law section 349 provides that a "court may award reasonable attorney's fees to a prevailing plaintiff." N.Y. Gen. Bus. L. § 349(h) (Consol.2001).

■ The decision of the trial court to award attorney's fees under section 349 is discretionary. This conclusion flows from the language of the statute that "a court *may* award reasonable attorney's fees." (Emphasis added.) *See also Riordan*, 977 F.2d at 53–54 (2d Cir.1992) ("The fee award is left to the discretion of the trial court in all circumstances."); *Indep. Living Aids*, 25 F.Supp.2d at 131–32; *Berkshire Fashions, Inc. v. Sara Lee Corp.*, 729 F.Supp. 21, 23 (S.D.N.Y.1990), (declining "to exercise discretion" under N.Y. Gen. Bus.L. § 349(h)). The scope of that discretion under section 349 is treated similarly under many other federal and state statutes allowing attorney's fees. *See, e.g., Crescent Publ'g Group, Inc. v. Playboy Enter., Inc.*, 246 F.3d 142, 146 (2d Cir. 2001) (an award of attorney's fees is "highly deferential to the district court" under the Copyright Act); *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (broad discretion in awarding fees under contract law); *Huff v. C.K. Sanitary Sys.*, 260 A.D.2d 892, 688 N.Y.S.2d 801, 806 (1999) (discretion standard in fee awards under N.Y. C.P.L.R. § 909); *Haydock v. Haydock*, 254 A.D.2d 577, 679 N.Y.S.2d 165, 167 (1998) (discretion standard for fee awards under N.Y. Dom. Rel. L. § 238); *Keehn v. Keehn*, 137 A.D.2d 493, 524 N.Y.S.2d 238, 242 (1988) (discretion under N.Y. Dom. Rel. L. § 237).

■ In awarding attorney's fees under section 349, the district court's determination is reviewed on appeal for abuse of discretion. *See Riordan*, 977 F.2d at 53–54. This standard is similar to that employed in other federal and state statutes allowing attorney's fees. *See, e.g., Huff*, 688 N.Y.S.2d at 806 (review of fee awards under N.Y. C.P.L.R. 909 is for abuse of discretion); *Haydock*, 679 N.Y.S.2d at 167 (same for Dom. Rel. L. § 238); *cf. Beazer v. New York City Transit Auth.*, 558 F.2d 97, 100 (2d Cir.1977), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (court award of a "premium" of $50,000 in addition to the attorney's fee requested was an abuse of discretion); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999) (district court abused its discretion in arbitrarily awarding only half of lodestar amount in Title VII action).

■ In section 349 proceedings, an abuse of discretion occurs if the district court fails to take into account the factors used by New York State courts in determining the fee award. *In re Brehm*, 37 A.D.2d 95, 322 N.Y.S.2d 287, 290 (1971) (an "improvident exercise of discretion" when a lower court cut attorney's fees by one half without assessing the factors New York state courts usually consider); *see also Riordan*, 977 F.2d at 53–54. This result is similar to that under federal law where a district court "abuses its discretion if its conclusions are based on an erroneous determination of law, or on a clearly erroneous assessment of the evidence." *Crescent Publ'g*, 246 F.3d at 146. The justification for granting the trial court discretion in determining the amount of a fee award is based upon its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual mat-

ters." *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933.

Section 349 does not specify which party has the burden of showing reasonableness of fees, and there appear to be no cases which directly address this issue in the 349 context. There are numerous cases in related contexts. The general rule is that the "burden of showing the 'reasonableness' of the fee lies upon the claimant." *In re Karp,* 145 A.D.2d 208, 537 N.Y.S.2d 510, 515 (1989) (in fee award for conservatorship); *see also Mt. Airy Ins. Co. v. Town of Orangetown,* 22 F.Supp.2d 57, 59 (S.D.N.Y.1998) (the "burden of documenting the amount of an attorney's fee award falls on the party submitting the award" in insurance action); *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 (1983). In making its determination this court has placed the burden on the plaintiff of establishing its fee award by a preponderance of the evidence—the usual civil rule.

In assessing the reasonableness of fee requests under section 349, New York state courts consider many factors. These include "the time and skill required in litigating the case, the complexity of issues, the customary fee for the work, [and] the results achieved." *Riordan,* 977 F.2d at 53–54. In addition, the lawyer's experience, ability and reputation, the amount in dispute, and the benefit to the client should be considered. *Id. See also In re Estate of Gutchess,* 117 A.D.2d 852, 498 N.Y.S.2d 297, 300 (1986); *In re Estate of Ury,* 108 A.D.2d 816, 485 N.Y.S.2d 329, 330 (1985); *Indep. Living Aids,* 25 F.Supp.2d at 133–34 (noting factors under section 349); *Samara Bros.,* 969 F.Supp. at 901 (same).

Courts need not weigh every one of the possible fee-setting factors. "There is no hard and fast rule" for determining attorney's fees under New York law. *In re Brehm,* 322 N.Y.S.2d at 289; *Indep. Living Aids,* 25 F.Supp.2d at 133. When considering the important criterion of number of hours expended by the attorney, the "relevant issue [is whether] at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992). *See also Riordan,* 977 F.2d at 53–54 ("In setting this relationship between the amount recovered and the amount of the fee award, the district court merely exercised its discretion with respect to one factor considered in arriving at an appropriate fee award: the result obtained.").

The purpose of section 349 should be considered when deciding whether to award fees and how much should be awarded. *Indep. Living Aids,* 25 F.Supp.2d at 132 (E.D.N.Y.1998) (evaluating fees under section 349). New York General Business Law section 349(h) was enacted because of the demonstrated inability of the New York state Attorney General to adequately police false advertising and deceptive trade practices. In a memorandum approving the enactment of section 349(h) Governor Carey observed that by "providing for a minimum damage recovery and permitting attorney's fees," private enforcement of this consumer protection statute will be encouraged and it will "add a strong deterrent against deceptive business practices and supplement the activities of the Attorney General in the prosecution of consumer fraud complaints." Memorandum of Governor Carey, On Approving L.1980, chs. 345 and 346, 1980 N.Y. Laws 1867. *See also Indep. Living Aids,* 25 F.Supp.2d at 132 (noting history and purpose of § 349).

Attorney's fee awards are limited to successful claims. *See Indep. Living Aids,* 25 F.Supp.2d at 133. Where

successful and unsuccessful claims "intertwine to … a great extent [an award] based on the total recovery" is reasonable. *Riordan*, 977 F.2d at 53–54 (approving the lower court's attorney's fee award of fifty percent of the prevailing party's recovery). "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley*, 461 U.S. at 440, 103 S.Ct. 1933

■ Attorney fee awards under section 349 do not need to be in proportion to the damages awarded, and may exceed the amount of damages awarded. *Wilson v. Car Land Diagnostics Ctr., Inc.*, 2001 WL 1491280 at *2 (S.D.N.Y. Nov. 26, 2001) (awarding $10,000 in attorney's fees under section 349, which was five times the amount the plaintiff won in damages). The *Wilson* court noted: "An award of attorney's fees that is substantially larger than the verdict may be unusual, but in this case it is certainly not excessive." *Id.* at *3. *Cf. Sandi v. Dependable Auto Ctr.*, No. 99–CV–4340, 2001 WL 201849 (E.D.N.Y.2001) (Section 349 action where court awarded $22,485 due to defendant's misrepresenation of the odometer reading of a used automobile sold to plaintiff, and $7,147.50 in attorney fees and costs); *Samara Bros.*, 969 F.Supp. at 895 (awarded $275,000 in attorney fees under the Lanham Act and under § 349). In this respect, section 349 is similar to many other fee-shifting statutes. *See also, e.g., City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (plurality opinion) (fee award of $245,456.25 in civil rights action where $33,350.00 in compensatory and punitive damages was recovered); *United States Football League v. National Football League*, 887 F.2d 408 (2d Cir.1989) (prevailing party was awarded $1 in damages, which the court trebled to $3; court awarded over $5.5 million in attorney's fees and costs, in antitrust action under the Clayton Act); *Helbrans v. Coombe*, 890 F.Supp. 227 (S.D.N.Y.1995) (defendant was enjoined from removing prevailing party's beard and the court awarded $55,540.36 in attorney's fees); *Gay Officers Action League v. Commonwealth of Puerto Rico*, 247 F.3d 288 (1st Cir.2001) ($176,888.26 attorney. fees and costs awarded in challenge to anachronistic regulation); *Schneider v. Colegio de Abogados de P.R.*, 187 F.3d 30, 33 (1st Cir. 1999) (per curiam) ($230,975.92 in attorney fees for challenging bar dues); *O'Connor v. Huard*, 117 F.3d 12, 17–18 (1st Cir.1997) (attorney fees of unspecified amount awarded to plaintiff who received only nominal damages and injunctive relief).

Defendants have suggested that the retainer agreement be treated as a "cap"on any fee award. This position does not appear to have been adopted by any court in the context of section 349. The position has been rejected by several courts in other contexts. The Supreme Court declined to allow a prior agreement to cap fees in a civil rights suit, stating:

> The attorney's private fee arrangement, standing alone, is not dispositive.… The presence of a pre-existing fee arrangement may aid in determining reasonableness [but] … a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees. As we understand § 1988's provision for allowing a "reasonable attorney's fee," it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less. Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount.

*Blanchard v. Bergeron,* 489 U.S. 87, 93, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). Similarly, in context of the Copyright Act, the court of appeals for this circuit has noted that "while the actual billing arrangement does not necessarily establish a ceiling on the rate attributed to private counsel ... it is a significant factor in determining what rate is 'reasonable.' " *Crescent Publ'g,* 246 F.3d at 149. Rather than acting as a cap, the contingency agreement is a factor to be considered alongside all other factors the court weighs in determining the eventual fee amount. *See, e.g., Domon v. Warsitz,* 1993 WL 152079 at *5–*6 (W.D.N.Y. Apr.26, 1993) (contingency agreement a factor in determining § 349 fee amount); *cf. Riordan,* 977 F.2d at 54 (listing factors to be considered in setting fee; there is no mention of a cap set by the retainer agreement).

█ There is a serious question of whether paralegal time can be included in the fee award. It appears that no federal or state courts have addressed this question in the context of section 349. Defense urges the court to adopt the reasoning of a case in the City Court of New York, which disallowed certain paralegal costs in a fee application under New York Banking Law section 108(5)(e)(iv). *First Deposit Nat'l Bank v. Moreno,* 159 Misc.2d 920, 606 N.Y.S.2d 938 (Civ.Ct.1993). The counterargument is much more compelling. Where the Supreme Court has addressed the issue, it has found paralegal costs includable. *See Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("Clearly, a 'reasonable fee' cannot have been meant to compensate only work performed personally by members of the bar ... the term must refer to a reasonable fee for the work product of an attorney."). The court of appeals for this circuit has followed the Supreme Court's view in the context of other statutes. *See United States Football League,* 887 F.2d at

415–16 (antitrust action). Even *Moreno* provides some support for allowing paralegal costs. That court stated that non-inclusion of paralegal fees was counterproductive, since this penalized attorneys who saved costs by assigning work to paralegal assistants. *Moreno,* 159 Misc.2d at 923, 606 N.Y.S.2d 938. *Moreno*'s denial of fees stems from the attorneys poor documentation, which is not an issue in the instant case. *Moreno*'s statement that paralegal work is cost-effective and helpful to the client and the bar as a whole, is correct. Because of the Supreme Court and court of appeals statements on the issue, the lack of persuasive case law for the defense position, and for the practical reasons stated by the *Moreno* court, paralegal fees are fully includable.

In deciding a fee award, the trial court should make appropriate findings of fact and set out its calculations. "While not required in every case, an evidentiary hearing, or at the very least an opportunity to submit evidence, is necessary to determine the propriety of a fee award and the amount of such award if it is evident that the material facts necessary for those determinations are genuinely in dispute and cannot be resolved from the record." *Crescent Publ'g,* 246 F.3d at 147.

█ Section 349 fee applications require less rigorous documentation that similar claims made under federal statutes. *See Riordan,* 977 F.2d at 54 (noting difference between New York State and federal law requirements of documentation). Federal courts apply "the contemporaneous time records rule, whereby an attorney who fails to accompany a fee application with contemporaneous time records that specify the date, hours expended and nature of work performed will be denied the awarding of fees," but "New York state courts ... prefer that trial courts exercise

greater discretion in evaluating fee petitions." *Schwartz*, 142 F.Supp.2d at 330–31. This statement echoes and summarizes holdings of the court of appeals for this circuit and appropriate state courts. *See Riordan*, 977 F.2d at 53; *In re Karp*, 537 N.Y.S.2d at 515. The "state law substantive right to attorney's fees precludes application of the contemporaneous time records rule. Therefore, under New York law, courts may award attorney's fees based on contemporaneous or reconstructed time records." *Schwartz*, 142 F.Supp.2d at 331 (internal citation omitted).

 Under some statutes, the prevailing party rather than his lawyer is entitled to attorney's fees. *See Brown v. General Motors Corp.*, 722 F.2d 1009, 1011 (2d Cir.1983) (under 42 U.S.C. § 1988); *Oguachuba v. I.N.S.*, 706 F.2d 93, 97 (2d Cir. 1983) (Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)). Under New York law, "actual payment of attorneys' fees is not a condition precedent to a recovery of attorneys fees." *Senfeld v. I.S.T.A. Holding Co.*, 235 A.D.2d 345, 652 N.Y.S.2d 738, 739 (App.Div.1997), *citing Maplewood Mgmt., Inc. v. Best*, 143 A.D.2d 978, 533 N.Y.S.2d 612, 613 (1988). There is no reason why the client should not agree to pay the awarded fee in its entirety to counsel even though this exceeds the fee set by the retainer.

## IV. Findings of Fact and Law

 Based on its own observation of the extensive pre-trial, trial and post-trial proceedings, the court finds all of affiants' statements in support of Dewey's fee application to be accurate, except as stated below. Colloquy with the court on argument of the fee motions led plaintiff to concede that a deduction of approximately $1,200,000 from the amount originally sought was appropriate and this deduction has been included in the court's figure. The defendants did not challenge any of the factual statements in the affidavits supporting the fee. Nor did they present evidence of their own or exercise the right afforded them to cross examine the affiants.

The court finds that the total amount of fee earned by the attorneys for plaintiff for work required solely to obtain its judgment under section 349 was $37,841,054.22. The computation of hours expended was accurate, every question being decided by Dewey in favor of lesser hours. The rates per lawyer and others employed by counsel were appropriate and at the lowest scale acceptable by a law firm such as was employed by plaintiff. The judgment as to which part of the attorneys' work would not have been required had plaintiff sued only on the facts and theory it succeeded on was appropriate and conservative, every decision favoring a lesser fee.

Based upon the supporting time sheets and other data submitted to the court, as well as the court's own observations and experience, a greater figure under the lodestar approach could have been supported by the plaintiff. The history of the litigation, figures supporting calculations, times expended and calculations are accurate except insofar as they understate the allowable fee application. In the absence of any significant challenge to these numbers they are accepted and found as facts to be true. Nothing would be gained by in effect copying the bulk of plaintiff's affidavits as explicit findings of fact; they are found as fact without now being repeated.

The court accepts and finds as true: The affidavits of Paul J. Bschorr of January 24, 2002, of December 6, 2001, of November 20, 2001, and of September 19, 2001 (attached to the fee application); of Joseph Angland of January 23, 2002; of Jeffrey D. Chansler of January 24, 2002; of Heather

K. McDevitt of December 6, 2001; and the agreement for professional services and later agreements by plaintiff with its counsel to pay any fees obtained in this proceeding to Dewey, less fees already advanced; and relevant discovery materials submitted to defendants and the court on this motion for fees. These materials have all been considered and found to be accurate and reasonable, except as stated below. None of the fee supported by these documents was earned for any work done in related litigation for any other Blue Cross / Blue Shield clients.

The fee earned and fully established for section 349 work necessary to obtain the judgment is, as found as a fact, $37,841,054.22.

The fee requested can be broken down as follows: The original affidavit stated that four senior partners, Paul J. Bschorr, Vincent R. FitzPatrick, Jr., Joseph Angland, and Martha Talley, worked on the "Core Team." They billed a total of 17,206.78 hours for a total fee of $9,288,455; the average rate was $540 per hour. Dewey's core team also included two junior partners, Robert Morrow and Michael Hefter, and three associates, Heather McDevitt, Paul Carberry, and Jack Pace III. They billed a total of 29,420.71 hours for a total fee of $9,184,458; the average rate was $312 per hour. Lawyers apart from the core team also worked on the matter. Other partners, as a group, billed a total of 5,976.15 hours on the matter and charged $2,684,808; their average hourly rate was $449. Other associates billed 43,689.75 hours and charged $11,944,457; the hourly average was $273. Legal assistants billed 47,157.40 hours and charged $5,752,323; the hourly rate was $122. Internal Dewey employed economists billed 595.63 hours and charged $182,059; the hourly rate was $305. An additional 210.25 hours were spent opposing defense petitions in the court of appeals for the Second Circuit. Dewey requests a fee of $52,284 for this cost. These hours should not, the court decides as a matter of discretion, be covered by section 349 in this case. Based upon these figures, Dewey originally requested a total fee award of $39,086,223 (Bschorr First Aff. at 42).

A second affidavit was prepared which had slightly different figures. This affidavit included incremental increases in the hours of the attorneys working on the litigation. It stated accurately that they were "arithmetic and limited allocational changes." There were two additional significant changes. Mr. Angland's hours were cut from 4420.75 to 4035.10. Also, an additional 2,000 hours of legal assistants' work was added to the tally. The result was a slightly larger figure of $39,182,722 requested.

A third affidavit noted that 805 hours were spent in litigating the fee application, for a cost of $179,100 (Bschorr Third Aff. at ¶¶ 3–4; see also Bschorr Fourth Aff. at ¶ 17).

The total fee requested as adjusted by Dewey was then $39,361,822.

The court requested that the parties ensure that all work not done for Empire's 349 claim be excluded from the calculus. A Fourth Bschorr Affidavit was submitted to address this problem. This affidavit stated that of the $39,361,822 requested, a total of $1,209,740 was for claims which had not been successful (RICO, antitrust, and common law fraud). After subtracting these amounts, Dewey requested a fee of $38,152,082. This was for all the work done for Empire as if it were the only plaintiff and the section 349 claim the only claim. Services were billed at the full rate requested. Conference calls, meetings, and related activities were billed at a 50% rate.

The court makes further deductions from the requested fee. The first involves Dewey partner Joseph Angland who worked primarily on the damages part of the claim. Because of the nature of his records, it was impossible to fully separate the "only Empire, only 349" work from other work. Mr. Angland estimated that well over 90% of his time—his estimate is 98%—was spent on Empire's 349 claim. (Angland Aff. at 2). Based on this affidavit, Dewey added in Mr. Angland's hours at a reduced rate of 90%, which was designed to be a conservative accounting for his time. (Bschorr Fourth Aff. at ¶ 15). The total amount of Mr. Angland's services Dewey wished to include was $2,112,547.88. *Id.* The court notes that this number submitted in the fourth Bschorr affidavit is in excess of 90% of Mr. Angland's total fees listed in the first Bschorr affidavit. That affidavit showed Mr. Angland billing a total of $2,311,379. Ninety percent of that sum gives the figure $2,080,241.10. The nature of Mr. Angland's record keeping requires that his fee be treated in the most conservative way. The court therefore substitutes the lower figure in the calculation. This reduces the total award by $32,306.78.

The second number to be resolved is the fee for legal assistants. Between the first and second affidavits, the "arithmetic and allocational" changes added over 2,000 hours of legal assistants' services. Such changes are too drastic to be making at the stage of supplemental affidavits without some explanation. (Dewey has stated that these are not fees incurred in the fee application itself.) Since the explanation provided is not sufficient for the sudden increase in allocated hours, only the amount originally requested for legal assistants will be awarded—that is, $5,752,323 rather than $5,978,760. This reduces the fee awarded by $226,437.

The application also includes $52,284 for services incurred for activities in the court of appeals for the Second Circuit. These are de minimis and the services have not been observed by this court. Accordingly, they are not allowed.

The total fee awarded is $37,841,054.22, which represents the final Dewey request of $38,152,082 for the work done, less adjustments of $32,306.78 for Mr. Angland's hours, of $226,437 for legal assistants, and of $52,284 for work before the court of appeals for the Second Circuit. The numbers are presented for ease of viewing in the following table:

| | |
|---|---|
| Core Team Fees Requested | $18,420,637 |
| None–Core Attorney Fees Requested | $20,709,801 |
| Second Circuit Litigation Fees Requested | $52,284 |
| Fees on fee application | $179,100 |
| Total Amount Requested in Fourth Bschorr Affidavit | $39,361,822 |
| Less: Amount of RICO and common-law claims | −$1,209,740 |
| Less: Second Circuit Litigation Fees | −$52,284 |
| Less: Adjustment for Mr. Angland's hours | −$32,306.78 |
| Less: Adjustment for legal assistants' hours | −$226,437 |
| Total Fee Awarded | $37,841,054.22 |

The court finds as a mixed question of law and fact the following:

(1) The fees allowed are sufficient and no greater than necessary to attract excellent attorneys who will devote their resources appropriate to the case and other cases such as this.

(2) The fees are not so great as to encourage poor cases to be litigated or excessive resources dedicated to the case on the theory that defendants will be "compelled" to settle because of the threat of huge fees, or on the gamble that the large fee may be allowed in an occasional "successful" suit, overcoming losses when litigations fail.

(3) The fees are not disproportionate to the probable value of the case. Probable value is reflected to a considerable degree in the reality of what was obtained in the actual suit under difficult litigation conditions and newly pressed legal and scientific theories.

(4) The cost of support to Dewey by advice from in-firm experts and in-firm paraprofessionals is appropriate. Non-firm expert fees for preparation of reports, depositions and testimony are not included as statutory fees.

(5) The fee is not greater than counsel actually would earn were the case "successful." The attorney's experience, ability and reputation have been considered in determining the fee that probably would have been earned.

(6) The fee has been reduced to exclude work that would not have been necessary had theories other than section 349 not been incorporated in the suit. No leeway on time or fees for excessively imaginative use of other supporting theories has been allowed.

(7) There has been no unnecessary inefficiency or wasteful overstaffing, or duplicative work.

(8) The hourly rate or percentage of recovery, or combination of the two, does not exceed the norm for the appropriate legal community.

(9) The specifics of the contingency fee arrangement with the client are not decisive. They have been fully considered in setting the fee.

(10) The trial court's experience with the case and similar cases bears on the award. A precise mechanical formulae is not possible. In general, the federal lodestar method, while not binding in state substantive law cases, is an acceptable and readily applicable method even in Erie cases. Moderation is desirable and has been applied.

(11) In short, the court has melded appropriate criteria, looking to the purpose of the statute at issue. It has considered the time and skill required in litigating the particular case, the complexity of the issues, the customary fee for the work, the results achieved, the lawyer's experience, ability and reputation, the amount in dispute, the potential benefit to the client, the benefit to society, the original fee agreement with the client, and the responsibility assumed by Dewey. It has also taken into account that the fee will not constitute a windfall to the client since it will be paid to Dewey, superceding the original fee agreement. These findings mirror the factors courts have set out as relevant in determining the fee award.

Defendants have made powerful, but ultimately unpersuasive, arguments that the fee earned by the plaintiffs should not be recovered in the case and, if any fee is allowed, it should be either capped by the original contingency arrangement the plaintiff entered into with counsel, or should be on the order of a few million dollars, but certainly not more than the amount of the judgment.

The court has seriously considered these and other arguments made by the defendants. It concludes as a matter of discretion that the appropriate fee is $37,841,054.22.

Defense arguments that the award should be further reduced to reflect the plaintiff's "partial success" are not persuasive. Plaintiff's counsel has already adjusted the amount requested, in accordance with this court's instructions, to exclude fees on unsuccessful claims. It is true that plaintiff did not recover the full amount sought on the section 349 claims. That claim, however, was ultimately successful since damages were awarded. The section 349 claim established a new legal theory of liability, and so prevailing under that theory at all, even if not for

the full amount sought, should be treated as a success for purposes of avoiding any reduction due to "partial success."

Defendants, purveyors of harmful commodities, have been forced to pay for some of the harm their products have cost others. This case could well have a deterrent effect, alerting potential future malefactors to the possibility of liability under section 349, and perhaps convincing them (upon advice from their attorneys) to avoid entering into similar harmful activities. These benefits to the public interest advanced in this case, and designed by the New York State legislation, weigh in the plaintiff's favor. Lawsuits which advance the public interest are especially good candidates for fee shifting. *See supra*, Part III.1 (public interest rationale in fee shifting statutes).

 In considering the sum awarded, the court acknowledges that it is substantial. Its favorable impact on plaintiff and its counsel is somewhat reduced by the failure to allow costs of capital to the attorneys while they were litigating and advancing payroll and expenses. In the court's discretion under the statute, no pre-judgment interest on the fee is granted. *Cf.* N.Y. C.P.L.R. § 5002 (Consol.2001) (interest from verdict mandatory). Discretion under the specific statute applicable overrides the general procedural rule. The amount of such interest would have been significant. The court also rejects, in its discretion, costs and disbursements claimable by both defendants and plaintiffs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.

At one point in the proceedings, the court suggested that 50% of the total cost to the plaintiff of the litigation might be appropriate. *Blue Cross*, 2001 WL 1328458 (Sept. 17, 2001). It has since concluded that this view was unfair and required more precision. As noted above, Dewey has consistently kept excellent rec-ords and has submitted a request conservative in scope. Similarly, it has absorbed loss of interest from invested capital, and cost of witnesses, depositions, and trial transcripts. The plaintiff has also absorbed loss of time of plaintiff's own employees in assembling data and appearing at depositions and at trial. When these factors are considered, it can be estimated that the fee now awarded represents far less than the total cost of the litigation to plaintiff and Dewey considered as an entity—though probably somewhat more than 50%. It is, in total, considering all related factors, fair to both plaintiff and defendants and in accord with state policy, statutes, and cases and with federal procedure.

It may seem surprising to some that the court awards almost the full amount claimed, without substantial deductions. There is no reason to reduce honest and valid claims. In this case the claims are conservative. Higher claims could have been made, and probably justified. The fee sought is honest, is well-supported by the record as the court observed it, is made by ethical lawyers whose credibility the court accepts, and comports with the law and facts of this case. An honest lawyer, as well as any other worker, should be paid the full value of his or her services as soon as possible after the work is accomplished. *Cf.* Deuteronomy 24:15 (King James) ("At his day thou shalt give him his hire; neither shall the sun go down upon it."); Luke 10:7 (King James) ("The labourer is worthy of his hire.").

## V. Conclusion

Pursuant to section 349 of the New York General Business Law, attorneys fees are awarded in the amount of $37,841,054.22.

SO ORDERED