**BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., now known as Horizon Healthcare Services, Inc, (d/b/a Blue Cross Blue Shield of New Jersey, Horizon Blue Cross Blue Shield, Horizon Blue Cross Blue Shield of New Jersey, and Horizon BCBSNJ), and its subsidiary, Horizon Health Care of New Jersey, Inc. (d/b/a Medigroup of New Jersey, HMO Blue and Horizon HMO); BCBSD, Inc., (d/b/a Blue Cross Blue Shield of Delaware); Blue Cross and Blue Shield of Florida, Inc., and its affiliates, Health Options, Inc. and Capital Group Health Services of Florida, Inc., (d/b/a Capital Health Plan); Blue Cross Blue Shield of Georgia, Inc., and it affiliates HMO Georgia, Inc.; Bluecross and Blueshields of Massachusetts, Inc.; Bluecross Blue Shield of Michigan, and its subsidiary, Blue Care Network of Michigan Incorporated; Blue Cross Blue Shield of Mississippi, A Mutual Insurance Company, and its affiliate HMO of Mississippi, Inc.; Blue Cross and Blue Shield of North Carolina, and**

its subsidiaries Personal Health Plan of North Carolina, Inc. and Health Maintenance Organization of North Carolina; Blue Cross and Blue Shield of Vermont; California Physicians' Services, (d/b/a Blue Shield of California) and its affiliate, CareAmerica Life Insurance Company; Carefirst of Maryland, Inc., and its subsidiary Free State Health Plan Inc.; Empire Blue Cross and Blue Shield; Group Hospitalization & Medical Services, Inc., d/b/a CareFirst BlueCross BlueShield and subsidiary; Louisiana Health Service & Indemnity Company, Inc., (d/b/a Blue Cross and Blue Shield of Louisiana); Mountain State Blue Cross & Blue Shield, Inc., and its subsidiary, Parker Benefits, Inc., (d/b/a Super Blue HMO); New Hampshire–Vermont Health Service, (d/b/a Blue Cross Blue Shield of New Hampshire) and its subsidiaries, Matthew Thornton Health Plan, Inc., Matthew Thornton Insurance, Inc. and Health Initiatives, Inc.; HealthNow New York, Inc., (d/b/a Blue Cross and Blue Shield of Western New York, Blue Shield of Northern New York); Trigon Insurance Company, (d/b/a Trigon Blue Cross Blue Shield) and its affiliates, Physicians Health Plan, Inc., Healthkeepers, Inc., Priority Health Care, Inc., Peninsula Health Care, Inc., and Trigon Administrators, Inc.; Excellus, Inc., and its subsidiaries, The Finger Lakes Companies, Inc., (and its subsidiaries, Finger Lakes Health Insurance Company, Inc. and Finger Lakes Medical Insurance Company, Inc.), Excellus of Central New York, Inc. (and its subsidiary Excellus Health Plan, Inc.) and Upstate Holding Company, Inc. (and its subsidiary, Utica–Watertown Health Insurance Co., Inc.), Plaintiffs–Appellees,

v.

PHILIP MORRIS USA INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company; Liggett Group, Inc. and Liggett & Myers, Inc., Defendants–Appellants,

B.A.T. Industries P.L.C.; British American Tobacco Co.; United States Tobacco; Tobacco Institute, Inc.; Counsel for Tobacco Research–USA, Inc. The Smokeless Tobacco Council, Inc.; Hill and Knowlton, Inc.; John Doe, Unknown Corporations A–Z, Defendants.

Docket Nos. 02–7276(L), 02–7394(CON), 02–7424(CON).

United States Court of Appeals, Second Circuit.

Argued: Feb. 13, 2003.

Decided: Sept. 16, 2003.

Murray R. Garnick, Arnold & Porter, Washington, D.C. (Ursula Henniger, Womble Carlyle Sandridge & Rice, Winston–Salem, North Carolina; John B. Williams, Collier, Shannon & Scott LLP, Washington, D.C.; Kimberly S. Penner, Sedgwick, Detert, Moran & Arnold, New York, New York; William Allinder, Shook, Hardy & Bacon L.L.P., Kansas City, Missouri; Alan Mansfield and Stephen Saxl, Greenberg Traurig, New York, New York, on brief), for Appellants Philip Morris, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Liggett Group, Inc.

Leonard A. Feiwus, Kasowitz, Benson, Torres & Friedman LLP, New York, New York, on submission for Appellants Liggett Group, Inc, and Liggett Myers, Inc.

Paul J. Bschorr (Joseph Angland and Kathleen M. Kacsor, on brief), Dewey Ballantine LLP, New York, New York, for Appellee.

Before: VAN GRAAFEILAND, CABRANES, and F.I. PARKER,[*] Circuit Judges.

F.I.PARKER, Circuit Judge.[**]

Phillip Morris, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Liggett Group, Inc. and Liggett & Myers, Inc. ("Appellants") appeal from a decision of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) denying them judgment as a matter of law following a jury verdict in favor of Empire Healthcare, Inc. (d/b/a Empire Blue Cross & Blue Shield) ("Empire").[1] Empire alleged that defendants[2] engaged in a scheme to distort public knowledge concerning the risks of smoking, knowing that the public would act on the misinformation, and that this behavior resulted in Empire paying increased costs for medical services provided to subscribers with medical conditions that were either causally related to, or exacerbated by, smoking. At trial, the jury found that all defendants except British American Tobacco Company, Ltd. were liable under New York's consumer protection statute, and awarded $17,782,702 in compensatory damages.[3] The jury reject-

[*] The Honorable Fred I. Parker, who was a member of this panel, passed away on August 12, 2003. Prior to his death, Judge Parker participated in the consideration and decision of this case.

[**] Judge Parker was the principal author of the opinion of the Court.

1. Empire is one of many Blue Cross and Blue Shield Plans and their respective subsidiaries to bring claims in this action. The court below severed and stayed the claims of the other plaintiffs pending resolution of this appeal. Thus, despite the style of the caption, only Empire is a plaintiff-appellee.

2. In this opinion, the term "defendants" refers to all the defendants listed in the caption, whereas the term "appellants" refers only to the defendants who brought this appeal.

3. The jury found that Phillip Morris, Inc. was liable for 38% of Empire's damages; R.J. Reynolds Tobacco Co., for 37%; Brown & Williamson Tobacco Corp., for 16%; Lorillard Tobacco Co., for 8.5%; and Liggett Group, Inc. and Liggett & Myers, Inc., for a combined .5%. The jury awarded Empire $17,782,426 on Empire's direct claim under N.Y. Gen. Bus. L. § 349, and $11,829,784 on Empire's subrogated claim under N.Y. Gen. Bus. L. § 349. Judgment was entered on both claims, but because the damages for the subrogated claim were subsumed within the damages on the direct verdict, Empire's recovery was limited to $17,782,426.

ed Empire's other claims, and Empire has not appealed those decisions. The district court subsequently awarded attorneys' fees to Empire. Judgment was initially entered on November 7, 2001, and an amended judgment was entered on April 1, 2002. Appellants now appeal.

For the reasons set forth below, we reverse judgment on Empire's subrogation claim and will, in due course, remand the matter to the district court to enter judgment for Appellants on that claim. We reserve decision on the award of attorneys' fees, which may be affected by the outcome of the certification process. Finally, we certify two related questions to the New York Court of Appeals.

## I. BACKGROUND

### A. *Underlying Facts*

In April 1998, twenty Blue Cross/Blue Shield plans and their subsidiaries and affiliates (the "Plans") filed suit against defendant tobacco companies in the Eastern District of New York seeking to recover costs of providing health care to plan subscribers (a/k/a plan "members") as a result of medical conditions causally connected to, or exacerbated by, tobacco use. The Plans alleged that because of defendants' long-standing deception of the public as to the negative health consequences of cigarette smoking, the Plans' health care expenditures rose as a result of spending on subscribers who were harmed by defendants' products. The factual underpinnings of these claims are set forth in great length in three underlying district court opinions. *See Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F.Supp.2d 345 (E.D.N.Y. 2000) (granting in part, and denying in part, defendants' motion for summary judgment) ("Blue Cross I"); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 178 F.Supp.2d 198 (E.D.N.Y.

2001) (denying defendants' motion for judgment as a matter of law and granting plaintiffs' motion for judgment on the jury award) ("Blue Cross II"); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 190 F.Supp.2d 407 (E.D.N.Y. 2002) (awarding attorneys' fees) ("Blue Cross III"). We will therefore assume familiarity with the factual allegations and supporting evidence and not recount them here.

### B. *District Court Proceedings*

In April 1998 when the Plans commenced this action, they sought recovery under federal law, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et. seq.;* common law; and state statutory law, including New York's consumer protection statute, N.Y. Gen. Bus. L. § 349 ("Section 349"). Defendants unsuccessfully moved for dismissal on the grounds that the claims were remote and therefore barred as a matter of law. Defendants then unsuccessfully renewed their motion after this Court found similar common law and RICO claims were too remote to permit suit in *Laborers Local 17 Health & Benefit Fund v. Philip Morris Inc.,* 191 F.3d 229, 239–40 (2d Cir.1999). That motion was also denied. *See National Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 221 (E.D.N.Y.1999) (distinguishing the Plans from the health care insurers involved in *Laborers Local 17,* and explaining that the Plans had amended their complaint to assert a subrogation claim as an alternative basis for recovery).

In September 2000, the district court ruled that Empire's claims would proceed to trial alone, and that the other Plans' claims would be stayed pending resolution of the Empire trial. *See Blue Cross I,* 113 F.Supp.2d at 353. A 44–day jury trial was then held during which the jury heard

from 34 witnesses. *Blue Cross II*, 178 F.Supp.2d at 208. Empire put forth significant evidence that smoking causes cancer, that smoking increases medical costs, and that defendants engaged in deceptive practices, which included lying to the public about the link between cancer and smoking and misrepresenting their commitment to finding such a link, if any.

The jury found Empire's federal law and common law claims to be unsupported, but found that Empire's claims under Section 349 were supported by the evidence against all defendants except the British American Tobacco Company. The jury awarded Empire $17,782,702 on their direct claim under Section 349, and $11,829,784 on their subrogated claim under Section 349.

Appellants then moved for judgment as a matter of law. The district court denied the motion in an extensive opinion which explains both the underlying evidence and the district court's reasoning in great depth. We, therefore, will not recapitulate the district court's reasoning, choosing instead to refer the reader to the opinion: *Blue Cross II*, 178 F.Supp.2d 198. The district court subsequently awarded Empire nearly $38 million in attorneys' fees. *Blue Cross III*, 190 F.Supp.2d 407. An amended judgment combining the verdict and award of attorney's fees was entered in March 2002. Appellants now appeal from that judgment.

## II. DISCUSSION

On appeal, Appellants argue that the district court erred in denying their motion for judgment as a matter of law because: 1) Empire's Section 349 subrogation claim was not proper because Empire did not identify its subrogors and detail each subrogor's claim; 2) Empire lacked standing to sue under Section 349 because it was not acting as a consumer; 3) Empire's claim on its own behalf was too remote to be actionable under Section 349; 4) Empire did not provide sufficient evidence to prove causation and damages under Section 349; and 5) Empire was not entitled to rely on aggregate proof of causation and damages in proving its claim under Section 349. In addition, Appellants challenge the district court's award of attorneys' fees to Empire. We address each argument in turn.

### A. Propriety of Empire's Subrogation Claim

Appellants contend that they are entitled to judgment as a matter of law on Empire's subrogation claim because Empire failed to prove that any subrogor was entitled to recover.

In *Laborers Local 17*, 191 F.3d 229, we held that RICO and common law claims brought by a labor union health and welfare trust fund against tobacco companies and public relations firms, alleging that the companies' conspiracy to deceive the general public about the dangers of smoking caused the funds to pay out more money than they otherwise would have, were too remote to permit suit because they were purely contingent on harms to third party smokers. We noted, however, that while the claims were too remote to be viable under RICO or common law, "[t]he Funds may still bring a subrogation action to recover the medical costs paid out for the individual smokers . . . ." *Id.* at 241. Thus, an insurance company may bring a subrogation action against tobacco companies to recover certain medical costs resulting from smoking. Nevertheless, Empire's so-called subrogation claim must fail.

Empire never identified the actual number of subrogors or their names, much less provided any individualized information about the claims to which Em-

pire alleged it was subrogated. In addition, defendants were not permitted to obtain individual discovery about any such claims. As such, the so-called subrogated action was virtually identical to the action on Empire's own behalf (the "direct action"). This is clearly contrary to the common law understanding of the nature of subrogation claims. We have explained that "[a]s a general matter, a subrogation claim by an insurer 'depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured.' " *Allstate Ins. Co. v. Mazzola,* 175 F.3d 255, 260 (2d Cir.1999) (quoting *Great Am. Ins. Co. v. United States,* 575 F.2d 1031, 1034 (2d Cir.1978)). At the very least, a subrogation claim would require Empire to identify its subrogors and those subrogors' claims so that defendants would have the opportunity to assert defenses against those claims. Accordingly, two New York cases have held that claims such as these cannot properly be considered to be subrogated claims. *See A.O. Fox Mem'l Hosp. v. American Tobacco Co.,* 302 A.D.2d 413, 754 N.Y.S.2d 368 (2d Dep't 2003); *Eastern States Health & Welfare Fund v. Philip Morris, Inc.,* 188 Misc.2d 638, 652–53, 729 N.Y.S.2d 240, 252–53 (N.Y.Sup.Ct. 2000). There is no reason to believe that the New York Court of Appeals would find differently.

Accordingly, we hold that allowing Empire's claim to proceed under the guise of subrogation was improper as it was not a true subrogation claim.

### B. *Effect of Empire's Status as a Nonconsumer on its Standing to Sue on its own Behalf under Section 349*

■ Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service …." N.Y. Gen. Bus. Law § 349(a). Section 349 currently contains a private right of action such that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages …, or both such actions." N.Y. Gen. Bus. L. § 349(h).

■ Appellants argue that Empire lacked standing to sue on its own behalf under Section 349 because Empire is not a consumer and is not standing in the shoes of a consumer. However, a plaintiff need neither be a consumer nor be someone standing in the shoes of a consumer to have an actionable claim under Section 349. *See Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995). Accordingly, this court has allowed a corporation to use Section 349 to halt a competitor's deceptive consumer practices. *See Securitron,* 65 F.3d at 264. We explained in *Securitron* that "[a]lthough the statute is, at its core, a consumer protection device … it does provide a right of action to any person who has been injured by reason of any violation of this section." *Id.* (internal quotation marks omitted). We therefore held that a party has standing under Section 349 when its complaint alleges a "consumer injury or harm to the public interest." *Id.* (internal quotation marks omitted). Thus, "[t]he critical question … is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer …." *Id.* Here, Appellants' deceptive practices involved serious harm to the public. Empire presented evidence that by using deceptive practices, Appellants induced consumers to smoke and discouraged them from quitting smoking, thus significantly increasing their risk of illness and even death. Accordingly, we find that the fact that Empire was not a consumer of defendants' products does not prevent it from

having standing to sue on its own behalf under Section 349.

## C. *Possible Remoteness Bar to Empire's Direct Action*

Plaintiff's "direct" action is derivative of injuries to third parties and is, therefore, essentially indirect. *Laborers Local 17*, 191 F.3d at 240. Relying heavily on *Laborers Local 17*, Appellants argue that the phrase "by reason of" in Section 349(h) incorporates principles of proximate cause and thus that Empire's direct claim is not actionable under Section 349 because it is too remote. If the "by reason of" clause does amount to common law proximate cause then Appellants are correct. However, the issue is far less clear than Appellants claim.

In *Laborers Local 17*, we addressed parallel language in RICO, which states that "[a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue", 18 U.S.C. § 1964(c) (emphasis added), and we held that that language incorporated common law principles of proximate cause. 191 F.3d at 239–40. We also acknowledged, however, that state statutes may reject common law proximate cause requirements and may provide the basis for allowing suit on such derivative claims. *Id.* at 243. We have subsequently cautioned against the broad application of the proximate cause requirement set forth in *Laborers Local 17* to state statutes, noting that "the proximate cause requirements of RICO [are] more stringent than those of most states." *Desiano v. Warner–Lambert Co.*, 326 F.3d 339, 348 (2d Cir.2003).

While it is clear that our precedent would not prevent Empire's direct claim from being brought under a state statute, it is not clear that the claim can be brought under Section 349 specifically. Merely looking to the language of Section 349 does not resolve this question. The key phrase, "by reason of", has been interpreted to *not* require proximate cause in the context of the New York State Dram Shop Act, N.Y. Gen. Oblig. Law. § 11–101(1).[4] *Catania v. 124 In–To–Go, Corp.*, 287 A.D.2d 476, 477, 731 N.Y.S.2d 207, 208 (2d Dep't 2001) (finding that it is sufficient that there was " 'some reasonable or practical connection' between the sale of alcohol and the resulting injuries" but that "proximate cause . . . is not required") (citation omitted).

Section 349—like the Dram Shop Act and unlike RICO—relaxes other common law tort requirements. *See Stutman v. Chemical Bank*, 731 N.E.2d 608, 612, 709 N.Y.S.2d 892, 896, 95 N.Y.2d 24, 29 (N.Y. 2000) (justifiable reliance and intent to defraud are not required to establish liability under Section 349); *see also Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 533 (N.Y.1995) (intent to defraud or mislead and justifiable reliance are not required to establish liability under Section 349).

Since, like the Dram Shop Act, Section 349 does not require all elements of a traditional common law tort, it would be reasonable to interpret Section 349's "by reason of" phrase as consonant with the

---

**4.** The Dram Shop Act states in relevant part that:

> Any person who shall be injured . . . by any intoxicated person, or *by reason of* the intoxication of any person . . . shall have a right of action against any person who shall, by unlawful selling to or unlawfully

assisting in procuring liquor for such intoxicated person, have caused or contributed to such intoxication; and in any such action such person shall have a right to recover actual and exemplary damages.

NY Gen. Oblig. Law § 11–101(1) (emphasis added).

interpretation of the "by reason of" phrase in the Dram Shop Act. Indeed, consistent with such an interpretation, the New York Supreme Court for Richmond County has allowed suit for indirect injuries to proceed under Section 349. *See Vitolo v. Dow Corning Corp.*, 166 Misc.2d 717, 724, 634 N.Y.S.2d 362, 366 (N.Y.Sup.Ct.1995) (allowing a physician to sue silicon breast implant manufacturers under Section 349 for injuries that would not have occurred but for injuries to implant recipients).

There are, however, two New York state cases addressing claims similar to those in the case at hand which can be read to suggest a different interpretation. In *Eastern States, Health and Welfare Fund v. Philip Morris, Inc.*, 188 Misc.2d 638, 729 N.Y.S.2d 240 (N.Y.Sup.Ct.2000), the New York Supreme Court for New York County considered a variety of tort claims by health and welfare employee benefit and trust funds against tobacco companies. Plaintiffs sought a refund of monies incurred by their participants and beneficiaries who suffered from tobacco-related health care problems. The court, without mentioning the claims by name or discussing them separately, held that all failed because "there can be no direct link between the alleged misconduct of Defendants and the alleged damage to the Funds, as the damage to the Funds is remote, indirect, and derivative of third parties." *Id.* at 247, 188 Misc.2d at 645. While Appellants make much of this case, *Eastern States* never discussed Section 349 and it is not even clear from the opinion whether a Section 349 claim was part of that action.

Similarly, in *A.O. Fox Memorial Hospital v. American Tobacco Co., Inc.*, 302 A.D.2d 413, 754 N.Y.S.2d 368 (N.Y.App. Div.2003), the Second Judicial Department considered a claim brought under Section 349 by nonprofit hospitals and a trade association to recover certain costs of health care provided to tobacco users. That court held that the case was properly dismissed because "plaintiffs' purported economic injury is entirely derivative of the tobacco-related harm suffered by the individual patients and therefore too remote to permit recovery." *Id.* However, the court supported its holding by simply citing three cases which did not address Section 349. Nowhere did the court explain why those cases' holdings would also apply in the Section 349 context, and nowhere did the court discuss the text, history, or purpose of Section 349. Similarly, nowhere did the court discuss prior case law regarding how Section 349 should be interpreted and thus did not distinguish either the Dram Shop Act case (*Catania*) or *Stutman* and its progeny. Accordingly, neither *Eastern States* nor *A.O. Fox* provides us with much guidance in predicting how the New York Court of Appeals would decide this issue.[5]

In short, we cannot predict whether the New York Court of Appeals would find Empire's direct claim sufficiently direct to be actionable under Section 349. Given this uncertainty, we believe that the most prudent approach is to certify the underlying question to the New York Court of Appeals.

■■■ We may certify "unsettled and significant question[s] of state law ... [that] will control the outcome of a case." *Prats v. Port Auth. of New York & New Jersey*, 315 F.3d 146, 150–51 (2d Cir.2002) (quoting 2d Cir. R. 0.27). The mere fact that the New York Court of Appeals has not ruled on a legal issue does not mean that we should certify that issue. *See Goodlett v. Kalishek*, 223 F.3d 32, 38 n. 4 (2d Cir.2000) (indicating that the key ques-

---

**5.** We note that both the *Eastern States* and *A.O. Fox* decisions were rendered before our opinion in *Desiano* cautioned against applying the proximate cause requirement for RICO claims as set forth in *Laborers Local 17* to state statutes.

tion is not whether the New York Court of Appeals has actually considered the issue, but rather whether "sufficient precedents exist for us to make a prediction of how the New York Court of Appeals would decide the question before us"). Accordingly, as a general matter, "[w]e are bound ... to apply the law as interpreted by New York's intermediate appellate courts ... unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion." *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir.1999). Thus, in *Pahuta* we chose not to certify because the plaintiff had "not provided us with any reason to believe that the New York Court of Appeals would disagree" with lower court cases, which were consistent with precedent in other jurisdictions. *Id.*

■ However, certification "is appropriate where with respect to the question asked there is a split of authority; or, if there is a statute implicated, its plain language does not answer the question; or when what is presented is a complex question of New York common law for which no state authority may be found." *Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36, 41 (2d Cir.2000).

As explained above, the plain language of Section 349 does not provide us with guidance in resolving this question because that language is open to varying interpretations. Similarly, although there are lower court cases touching on the issue, it is possible that the New York Court of Appeals might not follow their lead given (1) the objectives of Section 349, (2) the fact that Section 349 clearly relaxes other common law tort requirements, and (3) the decisions in *Vitolo, Desiano,* and *Catania.*

The fact that resolution of this case will require analysis of important policy considerations of the state of New York also favors certification. *See New York Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 752 (2d Cir.2003) (certifying a question to the New York Court of Appeals because it is "likely to recur and involves import public policy considerations for the State of New York"); *Mark A. Varrichio & Assoc., Mark A. Varrichio v. Chicago Ins. Co.*, 312 F.3d 544, 545 (2d Cir.2002) (same). As the district court reasoned, allowing recovery could further the remedial and deterrent objectives of Section 349 by forcing violators to absorb the full economic costs of their wrongs. The district court opined that "[a]llowing manufacturers to shift billions of dollars in medical costs to first party insurers is inconsistent with the design of the New York consumer protection statute; it weakens consumer safety, dilutes incentives to make the marketplace more transparent, and ultimately shifts health care costs to innocent insured non-smokers." *Blue Cross II,* 178 F.Supp.2d at 235. On the other hand, there are also policy reasons for not allowing indirect suits including: 1) the difficulty of apportioning damages; 2) the risk of multiple recoveries; and 3) the fact that indirect claims may not be necessary where the directly injured party can seek a remedy. *See Laborers Local 117,* 191 F.3d at 237.

For the above reasons, we will respectfully certify the following question to the New York Court of Appeals: Are claims by a third party payer of health care costs seeking to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349 too remote to permit suit under that statute?

D. *Sufficiency of the Evidence as to Causation and Damages, Assuming that Individualized Proof of Harm was not Required*

Appellants argue that Empire's proof was insufficient to prove causation and

damages because: 1) no liability could be imposed for Appellants' alleged failures to disclose information; 2) Empire offered no proof that post–1980 misrepresentations caused it damages; 3) Empire failed to provide a model of damages that adequately segregated its costs for providing health care that resulted from defendants' violation of Section 349 as opposed to defendants' lawful conduct; and 4) Empire failed to provide sufficient evidence to allow the jury to apportion damages.

### 1. Liability for Failures to Disclose

■ Appellants argue that because they complied with the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. § 1334, they cannot be held liable under Section 349 for failing to disclose information about the health effects of cigarettes. The jury instructions, however, stated that for the "challenged acts or practices" to result in liability, Empire must "prove that the challenged acts or practices were misrepresentations and were misleading in a material way." Given these instructions, we are content that liability was predicated on Appellants' affirmative misrepresentations rather than on their alleged failures to disclose.

### 2. Sufficiency of Proof of Post–1980 Misrepresentations Causing Harm

■ Appellants argue that Empire's claims must fail as a matter of law as there was no proof that Empire was damaged by post–1980 misrepresentations because: 1) Empire offered no proof that specific subscribers were induced to smoke (or to not quit smoking) by any such misrepresentations; 2) Empire offered no proof that specific subscribers who were so induced were the same subscribers to incur smoking-related health care costs; and 3) Empire's experts offered no proof that Empire itself was damaged by post–1980 misrepresentations.[6] Notably, Appellants do not argue that they did not make misrepresentations post–1980.[7]

■ We find that there was sufficient evidence to support the jury's verdict. We "will upset a jury verdict only if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture.'" Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (quoting Stratton v. Department for the Aging, 132 F.3d 869, 878 (2d Cir.1997)). Accordingly, "we must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." Id. Needless to say, a party seeking to overturn a verdict based on the sufficiency of evidence bears "a very heavy burden." Id.

Although Empire concedes that it did not provide specific evidence that post–1980 misrepresentations induced specific subscribers to smoke and that these were

---

**6.** Appellants were only held responsible under Section 349 for post June 19, 1980 misconduct because prior to that there was no private right of action under Section 349. See Sabater v. Lead Indus. Ass'n, Inc., 183 Misc.2d 759, 770, 704 N.Y.S.2d 800, 807–8 (N.Y.Sup. Ct.2000).

**7.** The district court found that there were "more than sufficient examples of post–1980 misconduct to support [the] verdict." Blue Cross II, 178 F.Supp.2d at 269. The district court cited numerous examples of post–1980 misrepresentations. For example, even after 1980, Appellants represented to the public that it had not been established that smoking causes disease, that smoking was not addictive, and that they did not have internal research suggesting otherwise. Id. at 269–270. The district court found that "these communications were part of a general policy for the 1980s and beyond." Id. at 270.

the same subscribers to incur smoking-related health care costs, this does not compel judgment as a matter of law for Appellants. If individualized proof is not necessary (a question which we hold later in this opinion is best answered by certifying it to the New York Court of Appeals), the jury, charged with making credibility determinations and weighing the evidence, was entitled to draw these inferences based on the testimony before it. The jury heard subscribers testify about being induced to smoke by Appellants' misrepresentations, and heard testimony about what the post–1980 misrepresentations were and when they occurred. From such testimony, we think that it is reasonable that the jury could have determined that subscribers were in fact induced by those statements. Similarly, if individualized proof is not required, the jury was free to use the statistical evidence offered by Empire's experts to draw this conclusion. Finally, we find evidence in the record to suggest that Empire did sustain injury. Thus, Appellants' claim that Empire's experts offered no proof that Empire itself was damaged by post–1980 misrepresentations is merely one view of that evidence, not a necessary view of that evidence, and we reject Appellants' invitation to re-weigh the evidence.

In short, Appellants fail to satisfy the "heavy burden" required for judgment as a matter of law.

### 3. *Sufficiency of Empire's Proof as to Damages Caused by Unlawful Conduct as Opposed to Lawful Conduct*

▪ Appellants argue that even if Empire showed that it was damaged by post–1980 misrepresentations, Empire's proof of such damages was insufficient as a matter of law because Empire's model of damages did not adequately segregate its costs for providing health care services caused by Appellants' misconduct from costs that it would have incurred even if Appellants' had not violated Section 349. Appellants contend that the model, created by Dr. Jeffrey Harris, who was one of Empire's expert witnesses, assumed that defendants would have engaged in an anti-smoking campaign and that they would have warned the public that smoking can be lethal and that it causes lung cancer, emphysema, and heart disease.

Appellants mischaracterize the portions of Dr. Harris' testimony regarding the assumptions behind his model that they cite to support their contentions. According to that testimony, Dr. Harris calculated and testified about two types of damages. The first type of damages stemmed from defendants' alleged failure to innovate as the result of an industry-wide conspiracy not to compete on the basis of health claims. Dr. Harris testified that he believed that if the defendants had not engaged in such a conspiracy, they would have competed with one another to make safer cigarettes. It was in the context of discussing a world with such innovation that Dr. Harris testified that tobacco companies would have publicized health information about cigarettes in an effort to show that their own products would minimize negative health consequences.

The second type of damages Dr. Harris calculated were damages resulting from defendants' alleged dissemination of misinformation regarding the health effects of cigarettes.[8] Dr. Harris did not testify that his calculations as to these damages were

---

**8.** Contrary to Appellants' assertion, Dr. Harris did not admit that his damages model was unable to estimate the impact solely of defendants' affirmative misrepresentations. Rather, the testimony cited by Appellants for this proposition merely stated that Dr. Harris could not measure the *actual* damages, and so he had to estimate those damages.

based on an assumption that the defendants would have waged an anti-smoking campaign or any assumption that the defendants themselves would have provided the public with accurate information. While Dr. Harris did assume "better information" and "more correct information about smoking and less misinformation" when calculating the damages that resulted from Appellants' dissemination of misinformation, this does not mean that Empire provided insufficient proof of damages to support the jury verdict. Dr. Harris appears to have assumed that in the absence of the misinformation provided by defendants, there would have been more accurate information.[9] This is not an unreasonable assumption. The proliferation of false information can well have the effect of stifling the proliferation of accurate information. Similarly, many of the examples Empire gave of defendants providing misinformation were in response to specific requests for information (*e.g.*, testimony before Congress and responses to interview questions). It is not unreasonable to assume that in such situations, had defendants not given misinformation, they would have given accurate information.

In the end, however, it was the jury's responsibility to determine whether or not Dr. Harris' assumptions were reasonable and whether his estimates were reliable, and to evaluate the damages information before it. Given that defense counsel extensively explored on cross-examination the assumptions behind Dr. Harris' calculations, we find no reason to believe that the jury was not able to evaluate Dr. Harris' testimony in this way.

### 4. *Sufficiency of Empire's Proof of Damages Caused by Each Appellant*

The jury found that the defendants were not jointly and severally liable. Given this finding, Appellants argue that they are entitled to judgment as a matter of law on the grounds that the jury had no basis for apportionment because Empire's statistical model of its claimed damages did not apportion damages among defendants. We disagree, finding that the jury had a sufficient, albeit perhaps less than ideal, basis for assessing relative liability. When the jury was told about particular misrepresentations, the party making those misrepresentations was identified, thus allowing the jury to assess the relative blameworthiness of each defendant. Appellants argue that any apportionment based on the frequency and egregiousness of Appellants' misconduct would be improper speculation as to the effects of such behavior on subscribers. Appellants offer no support for this assertion and we find it to be without merit. In determining damages, the jury was allowed to act on "probable and inferential as well as (upon) direct and positive proof." *See Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (internal quotation marks and citation omitted). Thus, in a slightly different context, the Supreme Court explained that "in the absence of more precise proof, the jury could conclude [damage] as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business ...." *Id.* Moreover, when allocating liability to a defendant, a jury can take into consider-

---

**9.** Another interpretation of the testimony is that Dr. Harris was using "more information" and "less misinformation" somewhat interchangably. He had explained that in developing his model he used "more information" as a proxy for less misinformation because given

the nationwide nature of defendants' alleged misconduct, he could not find anyplace which was not exposed to misinformation, but only places that were exposed to more information that was accurate.

ation the relative blameworthiness of that defendant. *See Kreppein v. Celotex Corp.,* 969 F.2d 1424, 1426 (2d Cir.1992).

Appellants also suggest that the jury was not permitted to take market share into account when assessing liability because there is no reason to believe that defendants with higher market shares engaged in more misconduct. It is possible, however, that the New York Court of Appeals would permit market share liability in this case.[10] Moreover, regardless of whether the New York Court of Appeals would allow pure market share liability in the case at hand, liability was not, in fact, imposed according to market share. As Empire points out, while the jury was informed of the defendants' relative market shares, its assessment of relative liability differed significantly from those shares.

For the above reasons, we conclude that Appellants have failed to show that Empire did not offer sufficient proof to allow the jury to apportion damages.

E. *Propriety of Empire's Reliance on Aggregate Proof of Causation and Damages*

While Empire provided some information about individual subscribers, Empire relied on aggregate (*i.e.,* statistical) proof of causation and damages. Appellants ar-

gue that aggregate proof was not permissible because: 1) it violated Appellants' constitutional right to a jury trial; 2) it violated Appellants' constitutional right to due process; and 3) Section 349 requires individualized proof. We find that the first two arguments are without merit, while the third merits certification to the New York Court of Appeals.

1. *Right to a Jury Trial*

As the district court recognized in *Blue Cross II,* 178 F.Supp.2d at 256, the Supreme Court has explained that the Seventh Amendment "was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even [at the time of the adoption] so widely among common-law jurisdictions," *Galloway v. United States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943). As Justice Brandeis explained, the Seventh Amendment

> does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence. Changes in these may be made. New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice.... Indeed,

---

**10.** Appellants suggest that the New York Court of Appeals' decision in *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 750 N.E.2d 1055, 727 N.Y.S.2d 7 (N.Y.2001), indicates that the New York courts would not allow liability to be imposed according to market share. In *Hamilton,* the New York Court of Appeals explained that gun makers could not be held liable solely on a market share theory to relatives of persons killed by hand guns because guns are not fungible products, and the plaintiffs had not asserted that Appellants' marketing techniques were uniform and never tried to establish relative fault. *Id.* at 240–41; 1067; 19. However, the court distinguished another case, *Hymowitz v.*

*Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (N.Y.1989), in which it allowed market share liability to be imposed on makers of a drug that injured plaintiffs, stating that in that case "each manufacturer engaged in tortious conduct parallel to that of all other manufacturers, creating the same risk to the public at large by manufacturing the same defective product." *Id.* To the extent that the fungibility of the defendants' conduct in this case may fall somewhere in between that in *Hymowitz* and that in *Hamilton,* it is unclear whether the New York Court of Appeals would permit market share liability here.

such changes are essential to the preservation of the right. The limitation imposed by the amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with.

*In re Peterson,* 253 U.S. 300, 309–10, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

■ Nevertheless, Appellants argue that their Seventh Amendment rights were violated by allowing aggregated evidence of causation and harm (as opposed to separate evidence about each individual subscriber). First, Appellants rely on two Fifth Circuit opinions, neither of which would be controlling even if we were bound to follow them. Not only do both cases address class action claims, not direct actions, but neither held that aggregate evidence of causation violates the Seventh Amendment. In the first case, *In re Fibreboard Corp.,* 893 F.2d 706 (5th Cir. 1990), the Fifth Circuit explicitly declined to decide whether Appellants' right to a jury trial was violated when the district court consolidated over 3,000 separate, asbestos-related, personal injury cases. *Id.* at 712. In the second, *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297 (5th Cir. 1998), the Fifth Circuit struck down a revised trial plan for the same asbestos-related cases on Seventh Amendment grounds, but not because the cases were consolidated or because causation was based upon aggregated evidence. Rather, the Fifth Circuit determined that the Seventh Amendment was violated because under the trial plan the jury was not to determine damages of the group as consolidated, but was only to consider the damages of certain members of the plaintiff class. *Id.* at 320.[11] Accordingly, these

cases do not support Appellants' argument.

Appellants next argue that their right to a jury trial was violated because, by consolidating "snippets" of testimony from a variety of subscribers, Empire was able to create a "perfect subscriber" and to litigate the case on that basis. They argue that because Empire chose excerpts of subscriber depositions rather than presenting the complete depositions to the jury, the jury was not allowed to fully evaluate the testimony, and therefore Appellants did not receive a true jury trial. Appellants rely primarily on *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir.1998), in which the Fourth Circuit considered whether it should allow the claims of named plaintiffs to go forward after decertifying a class. In deciding that such claims should not proceed, the Fourth Circuit wrote: "plaintiffs enjoyed the practical advantage of being able to litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together for litigation." *Id.* at 344. The court explained that plaintiffs had used the method of a class action to present a case that was much stronger than any individual's claim, apparently by selectively choosing named plaintiffs. *Id.* at 345. By contrast, the individuals deposed in the case at hand were selected randomly, not by Empire, and thus there is little concern that their cases are unusually robust. Moreover, Appellants had access to the same depositions as Empire. If Appellants felt that Empire misrepresented the actual depositions, they had ample opportunity to introduce portions of those depositions to demonstrate that point or to introduce other, more favorable, depositions.

11. According to the trial plan, a separate jury would determine what damages the class as a whole was entitled to by extrapolating from the amount of damages owed to these particular class members. *Id.*

Appellants finally allege that their right to a jury trial was violated because one of Empire's experts relied on a model which incorporated work done by college students who coded each of the depositions to place them in certain categories provided by counsel for Empire. Appellants argue that, under this system, college students—not the jury—analyzed key testimony and thus Appellants' Seventh Amendment right to a jury trial was violated. We find no merit in this argument. Appellants' logic would suggest that whenever an expert witness's opinion relies on analyses of the evidence done by persons other than jurors, and the jurors do not themselves analyze all of that evidence independently, the Seventh Amendment is violated. Appellants have cited no authority to support this proposition, nor have we found any. Moreover, if Appellants felt that the college students were not categorizing the depositions properly, or were not the proper persons to be categorizing them, Appellants were free to make this argument to the jury.

### 2. *Right to Due Process*

■ Appellants argue that their due process rights were violated when they were held liable based on aggregated proof and without being able to cross examine each of Empire's subscribers who allegedly incurred greater health care costs due to their tobacco use.

To support their argument, Appellants point to the New York Supreme Court's finding in *Eastern States* that defendant tobacco companies had a due process right to cross-examine each individual subrogee in a subrogation action brought against them. 188 Misc.2d at 653, 729 N.Y.S.2d at 253 (citing *Small v. Lorillard Tobacco Co.,*

*Inc.,* 252 A.D.2d 1, 8, 679 N.Y.S.2d 593, 602 (1st Dep't 1998) (finding that defendant tobacco companies had a due process right to cross-examine each class member)). Neither *Eastern States* nor *Small,* however, persuade us that such due process rights would attach in the context of Empire's direct claim.[12] Unlike class action claims and subrogation claims, Empire's direct claim is not simply a consolidation of other individuals' claims. In the direct suit, the claims of individual subscribers are not being pursued by Empire. Rather, those claims essentially function as evidence of Empire's own harms. That is, Empire's costs were increased because Appellants' deception caused subscribers to smoke.

Appellants also place some reliance on the Fifth Circuit's holding in *Cimino,* 151 F.3d at 311, that plaintiffs' due process rights were violated by the district court's elaborate multi-phase trial plan. The Fifth Circuit explicitly declined to explain this finding, and Appellants have failed to explain either the rationale or its application to the case at hand.

Accordingly, we find that Appellants failed to show a violation of their due process rights.

### 3. *Individualized Proof under Section 349*

Appellants argue that Section 349 requires individualized proof of causation and damages and, thus, that aggregate proof is not sufficient.

It may well be that the New York Court of Appeals would find that individualized proof is necessary to bring a class action under Section 349. *See Carnegie v. H.R. Block, Inc.,* 269 A.D.2d 145, 147, 703

---

**12.** Because we have found that Empire's subrogation claim must fail because it did not meet the basic standards for subrogation, we need not address Appellants' argument that allowing the subrogation claim to proceed would violate their due process rights.

N.Y.S.2d 27, 29 (1st Dep't 2000) (holding that a class certification was in error because individualized proof would be necessary under Section 349 as to the fraudulent inducement of each class member and "issues arising in this connection would overwhelm any questions common to the class"); *Tegnazian v. Consolidated Edison, Inc.*, 189 Misc.2d 152, 155, 730 N.Y.S.2d 183, 187 (N.Y.Sup.Ct.2000) (denying class certification because "individualized inquiry" would be necessary); *cf Small*, 252 A.D.2d 1, 679 N.Y.S.2d 593 (finding that a lower court did not abuse its discretion by decertifying a class in part on the grounds that individualized proof was necessary for class members to prevail under Section 349, but neither approving nor disapproving of that court's apparent assumption that Section 349 would require proof as to each class member's behavior).

It is less clear, however, whether the New York Court of Appeals would require individualized proof for Empire's claim on its own behalf to succeed. No New York case has yet to extend the requirement of individualized proof outside of the class action or subrogation context, the New York Court of Appeals has never held that individualized proof is necessary for all claims brought pursuant to Section 349, and—unlike class action claims and subrogation claims—Empire's claim on its own behalf is not simply a consolidation of other individuals' claims. Given the significant uncertainty as to how the New York Court of Appeals would decide this issue, we believe that the most prudent approach is to certify the underlying question to the New York Court of Appeals.[13] Specifically, we respectfully certify the following question: Is individualized proof of harm to subscribers required when a third party payer of health care costs seeks to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349?

### F. Propriety of the Attorneys' Fee Award

The district court awarded Empire $ 37,841,054.22 in attorneys' fees. The district court determined that this amount only covered fees for legal work that was relevant to Empire's Section 349 claims, and fees for work exclusively related to other claims and other plaintiffs were not allowed. *Blue Cross III*, 190 F.Supp.2d at 426. Because the certification of two issues pertaining to the Section 349 claim can have an impact on the award of attorneys' fees, we reserve decision on this issue awaiting the outcome of the certification.

### III. CONCLUSION

We REVERSE judgment for Empire on Empire's subrogation claim and will in due course REMAND to the district court with instructions to enter judgment for Appellants on that claim. We RESERVE DECISION on the award of attorneys' fees to await the outcome of the certification pro-

**13.** Both parties argue that the question of whether Section 349 requires individualized proof should not be certified. Empire argues that this is a procedural question and is therefore governed by federal law. Appellants argue that this question involves the interplay of state law and the *Erie* doctrine and thus can only be decided by this Court. We do not believe the question is procedural, but rather that it is substantive. In essence the question is: what are the elements that must be proven to prevail in a Section 349 action? Specifically, the issue is not whether the evidence was of a type that may be used to show liability, but rather whether Empire must show that particular individuals were harmed in particular ways under particular circumstances to prevail on a Section 349 claim. Thus, New York law applies.

cess. With respect to Empire's claim on its own behalf, we hold that: 1) Empire's status as a non-consumer did not bar it from having standing to bring a claim under Section 349 on its own behalf; 2) Appellants have not shown that either their right to a jury trial or their right to due process was violated; and 3) if individualized proof is not required under Section 349, Empire's proof was legally sufficient to establish both causation and damages, and to allow the jury to apportion those damages. Finally, we find that Empire's direct claim will be actionable only if: 1) the claims are not considered too remote under Section 349, and 2) Section 349 does not require individualized proof of harm to subscribers.

Because there is considerable uncertainty as to how the New York Court of Appeals would decide these last two issues, we hereby respectfully certify the following questions to the New York Court of Appeals:

1. Are claims by a third party payer of health care costs seeking to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349 too remote to permit suit under that statute?

2. If such an action is not too remote to permit suit, is individualized proof of harm to subscribers required when a third party payer of health care costs seeks to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349?

The certified questions may be deemed expanded to cover any further pertinent question of New York law involved in this appeal that the Court of Appeals chooses to answer. This panel retains jurisdiction and will consider any issues that may remain on appeal once the New York Court of Appeals has either provided us with its guidance, or declined certification.

It is therefore ordered that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of the briefs, appendices, and record filed in this Court by the parties.

### CERTIFICATE

The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to 2d Cir. R. § 0.27 and N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17, as ordered by the United States Court of Appeals for the Second Circuit.